209 So.2d 329 (1968)
Mrs. Anita TULLY, wife of and Dr. Harry WAX
v.
Vernon B. WOODS.
No. 2950.
Court of Appeal of Louisiana, Fourth Circuit.
April 8, 1968.
Rehearing Denied May 6, 1968.
Writ Refused June 21, 1968.
*330 Martin A. Welp and Levy, Smith & Pailet, Adolph J. Levy, Ellis Jay Pailet, New Orleans, for plaintiffs-appellants.
Milling, Saal, Saunders, Benson & Woodward, G. Henry Pierson, Jr., John C. Christian, Lawrence K. Benson, Jr., New Orleans, for defendant-appellee.
Before SAMUEL, CHASEZ and BARNETTE, JJ.
BARNETTE, Judge.
The plaintiffs-appellants are Mrs. Anita Tully, wife of and Dr. Harry Wax. They have appealed from a judgment rejecting their demands and dismissing their suit for rescission of a contract by which they exchanged certain residential property on West End Boulevard for a residence on Bristol Place, both in the City of New Orleans. The Bristol Place residence is in the Algiers section of the City. A substantial amount of cash was paid by plaintiffs in the exchange transaction to compensate for the difference in values of the two properties.
Dr. Wax is a podiatrist and at the time of the exchange transaction was studying law at a local law school. He has since been admitted to the bar. During his course of study he practiced his profession of podiatry from an office located in his home and attended night classes at the law school. It is alleged that he has a supersensitive hearing condition diagnosed as hyperacusia. Because of this abnormal sensitivity to noises he contends that he must have a quiet place in which to practice podiatry and to pursue his courses of study. It is alleged that the desire to obtain a more quiet environment was a material consideration in moving to the Bristol Place address.
Dr. Wax was asked if he ever had medical treatment or had consulted a specialist relative to his abnormal hearing sensitivity and he said, "since moving to the Bristol Place I have." It was then that he consulted Dr. Richard Street who first saw him on September 14, 1962, and who gave the diagnosis of hyperacusia. The doctor knew of no history prior to 1962.
We have read the transcript of testimony and considered the pleadings and exhibits filed in evidence, and are in complete agreement with the factual and legal conclusions *331 reached by the trial judge. We could not improve on the statement of the case, the analysis of the testimony, nor the interpretation and application of the pertinent ordinances and jurisprudence referred to by the trial judge in his excellent "Reasons for Judgment." We therefore adopt as our opinion, the Reasons for Judgment in toto as follows:
"Dr. and Mrs. Harry Wax instituted these proceedings against Mr. Vernon B. Woods to obtain rescission of the contract by which plaintiffs acquired the residence situated at 2200 Bristol Place, Orleans Parish, Louisiana, and to recover `damages caused by the misrepresentations of the defendant.' The alleged grounds for rescinding the contract are that Dr. Wax was bothered by alleged noises in the Bristol Place area; that building restrictions and zoning regulations prevented plaintiffs from converting the carport into an office, and that defendant practiced `fraud and misrepresentation' upon plaintiffs with regard to those two matters. Alternatively, plaintiffs prayed for damages for alleged defects in construction.
"Defendant denies the alleged lack of quietness in the neighborhood and avers that the zoning and building restrictions are not of such a nature as to give rise to rescission of the exchange; denies that he made any representations concerning the quietness of the neighborhood, or zoning and building restrictions; denies that he practiced any fraud or misrepresentation upon plaintiffs. Defendant also denies that there are any defects in the construction of the building.
"In the alternative, defendant avers that plaintiffs were given every opportunity to investigate for themselves the matter of noise in the neighborhood, including the right to live in the house for a period of a week or ten days, and that plaintiffs knew or should have known of any zoning and building restrictions affecting the property.
"Further, in the alternative, defendant avers that plaintiffs have continued to live in the residence without attempting to sell same in an effort to minimize any alleged damages and that plaintiffs have been negligent in their actions and are estopped and barred by laches from demanding rescission of the exchange. Moreover, defendant has filed an exception of no cause or right of action to rescind the exchange on the ground that `prior to filing this suit plaintiffs did not offer to restore defendant, or themselves, to the status quo that existed and position that the parties respectively occupied prior to the said exchange, in that prior to filing this suit plaintiffs did not offer or agree to receive or take back the property located at 6015-17 West End Boulevard * * *.'
"From the evidence adduced, we find the following facts:
Dr. Wax, through the Gertrude Gardner Real Estate Agency, first attempted to acquire the residence at 2200 Bristol Place from Mr. Woods in the early part of 1962, but Mr. Woods was not agreeable to taking in trade Dr. Wax's house situated at 6015 West End Boulevard. Several weeks later, Dr. Wax telephoned Mr. Woods again, requesting that they trade houses. Again, Mr. Woods refused. Dr. Wax was insistent, however, and prevailed upon Mr. Woods to inspect the Doctor's residence on West End Boulevard, which was inspected by Mr. and Mrs. Woods one Wednesday evening.
"The following Sunday, Dr. Wax again visited the residence at 2200 Bristol Place, which was furnished as a model home and ready for occupancy. There, he talked to Mr. Woods and was shown several other houses in the area, but Dr. Wax was only interested in 2200 Bristol Place.
"Dr. Wax asked Mr. Woods whether there was any noise in the area of the Bristol Place property, to which Mr. Woods replied, `not as far as I know, except for the normal traffic noises on General Meyer *332 Avenue.' Dr. Wax confirmed that he had visited the Bristol Place property and driven around the surrounding area `seven or eight times.'
"A couple of weeks later, Dr. Wax telephoned Mr. Woods and requested that Mr. Woods take another look at the West End Boulevard property, which Mr. and Mrs. Woods did. Mr. Woods informed Dr. Wax that he would consider a trade.
"Mr. Morris Hyman, a realtor, had also been contacted by Dr. Wax concerning a possible purchase of one of Mr. Hyman's homes. Consequently, Mr. Hyman knew that Dr. Wax was in the market for a new home. During the day of July 7, 1962, Mr. Hyman happened to pass Dr. Wax who was walking on West End Boulevard. Mr. Hyman stopped and spoke to Dr. Wax, inquiring about his progress in acquiring a new home. After Dr. Wax explained his negotiations with Mr. Woods, Mr. Hyman suggested that the parties meet at his home that evening and try and work out an agreement. Mr. Hyman then telephoned Mr. Woods and invited him to meet with them that night.
"Accordingly, in the evening of July 7, 1962, Mr. Woods met Dr. Wax at Mr. Hyman's home. Dr. Wax advised Mr. Woods that he wanted to enclose the carport at 2200 Bristol Place so as to have space for a home office. Dr. Wax, Mrs. Wax, Mr. Woods and Mr. Hyman all confirm that Dr. Wax told Mr. Woods that he, Dr. Wax, `knew that under the City of New Orleans Zoning Ordinance he could use 15% of the area of the residence for a home office.' There is no disagreement as to the fact that it was Dr. Wax, not Mr. Woods, who knew 15% of the area could be used for an office. Neither Mr. Woods nor Mr. Hyman made any representations regarding those regulations. And, of course, Dr. Wax also knew of the regulations because he already had an office in his West End Boulevard home.
"But Mr. Woods was uncertain about the zoning regulations and, while at Mr. Hyman's home that night, telephoned Mr. Richard Church, an engineer who was thoroughly familiar with the zoning and building restrictions in the area as a result of his work in developing the Aurora properties, for an opinion. Mr. Church confirmed that he talked to Mr. Woods about the matter.
"Mr. Woods testified that he did not know of any building restrictions which would prevent using the carport as a doctor's office and that he did not make any representations to Dr. Wax about the restrictions. And Dr. Wax did not testify that Mr. Woods had made any representations concerning the building restrictions.
"That same evening, Dr. Wax inquired about the noise in the area of the Bristol Place property. In the presence of Mr. Hyman, Mr. Woods offered Dr. Wax a key to the residence and suggested that he spend a week or ten days there to see for himself whether there were any unusual noises which might bother him. Mrs. Wax also confirms that the offer was made. Dr. Wax refused the invitation.
"Mr. Woods then made a list of the work which would be necessary to enclose the carport, which list was later typewritten (Exhibit P-3) and made a part of the Exchange Agreement, and suggested the additional sum of $2,000.00 for enclosing the carport. It was agreed that the Bristol Place property would be valued at $39,500.00 and the West End property valued at $27,000.00. After all of the above had transpired, the parties reduced their agreement to writing that same night by executing the `Exchange or Trade Agreement.'
"On July 31, 1962, the exchange was consummated by the execution of the instruments. The value of each residence was reduced $1,000.00 in the final papers. At the closing, Dr. Wax was on vacation and was represented by Mr. Hyman, who signed the papers as his agent. After the exchange was completed, Mr. Woods proceeded to close in the carport and had it *333 `roughed-in' when Dr. Wax returned from his vacation.
"Upon Dr. Wax's return from vacation, he advised Mr. Woods that he wanted to make some changes in the interior partitions of the carport from the manner in which he had previously advised Mr. Woods to finish it (with movable curtains on wires). Mr. Woods prepared another sketch on the interior (Exhibit P-8), but Dr. Wax never gave Mr. Woods the `go-ahead' and hence, the carport remained unfinished.
"On July 23, 1963, Dr. Wax, by letter written by his attorney (Exhibit P-7) demanded rescission of the contract. The letter did not offer to take back the West End property in return for the Bristol Place property and this demand, which was eleven months and three weeks after the exchange, was the only demand in writing prior to filing suit. Mr. Woods testified that Dr. Wax never offered to take back the West End property, the petition makes no such allegation, and the plaintiffs failed to present any written evidence on this point.
"Additionally, not one scintilla of evidence was presented about the alleged defects in construction of the house.
"The evidence shows that Mr. Woods knew of no building or zoning restrictions which prevented Dr. Wax from utilizing the enclosed carport as a professional office. Mr. Woods did not make any representations regarding uses to which the property could be put. It was the plaintiff himself, Dr. Wax, who knew that 15% of the residence could be used for an office.
"Article III, Sections 1 and 26, of the Comprehensive Zoning Ordinance of the City of New Orleans, upon which plaintiffs allege (in paragraph 19 of the petition) that they `have learned that it is not possible to have the office constructed,' does not at all substantiate their assumption. Those provisions (Exhibit P-4) provide:
`1. Accessory Building: A subordinate building, attached to or detached from the main building, the use of which is incidental to that of the main building, and not used as a place of habitation or a living room, kitchen, dining room, parlor, bedroom or library.

* * *
26. Home Occupation: A professional occupation customarily conducted in dwellings and apartments, including that of a physician, surgeon, dentist, lawyer, clergyman, or other similar professional person; and dressmaking or tailoring; provided no person shall engage in such professional occupation, dressmaking, or tailoring, other than those who reside on the premises; and provided further that in no case shall more than fifteen percent (15%) of the floor area of any apartment in a dwelling, exclusive of any accessory building, be used for any one or more of the said occupations; and provided further that no home occupation shall be permitted in an accessory building; and provided further that no windows or other display or sign be used to advertise such occupancy other than a single sign not more than four inches (4") in width and eighteen inches (18") in length.'
And there is nothing in those provisions which prohibited Dr. Wax from utilizing an area in the carport of not more than 15% of the entire dwelling as a professional office. Mr. Richard Church, the civil engineer, and Mr. Frank E. Robin, chief building inspector for the Department of Safety and Permits for the City of New Orleans both testified that the enclosing of the carport was not in violation of the zoning restrictions because there was sufficient side yard and off-street parking. Although the carport might be considered as an *334 `accessory building' prior to being enclosed as part of the house, after it was enclosed it was not an `accessory building' as defined in Section 1, because it is not a `subordinate building,' but is another portion of the residence. Mr. Robin testified that once a structure is enclosed so that it can't be used for purposes other than residential, it ceases to be an `accessory building.' This carport, as the photographs Exhibits D-7 and D-8 show, is so enclosed that it cannot be used to park automobiles and can only be used for residential purposes.
"Because the carport was so enclosed that it could not be utilized for purposes other than residential purposes, because the set-back requirements are in compliance with the zoning regulations, and because the enclosure is in complete architectural harmony with the remainder of the building, Mr. Robin concluded that the enclosed carport at 2200 Bristol Place is not an accessory building. The enclosed area which was formerly a carport could, therefore, be utilized for a `home occupation' which, as Mr. Robin pointed out, is a residential purpose.
"Section 26 defines a `home occupation' as, `A professional occupation customarily conducted in dwellings and apartments, including that of a physician * * *.' The section then provides that `* * * in no case shall more than fifteen percent (15%) of the floor area' be used.
"Mr. Robin's only qualification, as set forth in the Ordinance, was that no more than 15% of the area can be used for `home occupations.' He further testified that so long as not more than 15% of the dwelling is used for an office, the City of New Orleans does not care how much of the area is enclosed, so long as it meets the set-back restrictions which this enclosure in fact met. There is no evidence in the record as to whether the enclosed carport constitutes more than 15% of the area of the dwelling since both Mr. Woods and Dr. Wax testified that they did not know the area or perimeter of the area excluding the carport. Consequently, although the question is moot, Dr. Wax was aware that he was restricted to the use of 15% and it was up to him, not Mr. Woods, to comply. For even if evidence had been adduced to show that the carport area itself amounted to more than 15% of the entire dwelling area, Dr. Wax was not in violation of the restrictions so long as he utilized the maximum space within such enclosure as an office. Obviously, Mr. Woods had no control over the space that Dr. Wax decided to utilize. Consequently, the 15% rule did not prevent Dr. Wax from using the enclosed carport as an office.
"Dr. Wax further contends (and from plaintiffs' memorandum this is the `central' and `primary' issue), that the building restrictions (Exhibit P-5) affecting the Bristol Place property prevented him from having a professional office in his home.
"The building restrictions provide that the lot will not be used for other than `residential purposes.' What, therefore, constitutes a use for `residential purposes'? Is it a use which is permitted in the highest type of residential area, the Class A Single-Family District? The Bristol Place property is situated in such a district.
"Article VIII of the City Zoning Ordinance (Exhibit D-9) sets forth the regulations for `A Single-Family Residential District,' and specifically includes, in subdivision 8 thereof, permission to conduct `home occupations,' which term includes professional offices and occupations. The building restrictions do not prevent home occupations, and the Zoning Ordinance specifically does permit them.
"Furthermore, under the definition of `home occupations' in Section 26 of Article III of the Zoning Code (Exhibit P-4), which allows professional practice in the home is found the provision that:
`* * * no windows or other display or sign be used to advertise such occupancy other than a single sign not more *335 than four inches (4") in width and eighteen inches (18") in length.' (Exhibit P-4)
Section 9 of the building restrictions also provides:
`No sign of any kind shall be displayed to the public view on any lot, except one professional sign of not more than one square foot, one sign of not more than five square feet advertising the property for sale or rent, or signs used by a builder to advertise the property during the construction and sales period.' (Exhibit P-5) (Emphasis added.)
"Consequently it is easily seen that both restrictions allow professional signs. And what type of `professional sign' could have been contemplated by the drafters of the building restrictions other than a professional sign to advertise home occupations?
"In deciding whether or not the building restrictions do prevent a professional man such as Dr. Wax from having an office in his home, the following basic principles of interpretation should be applied:
`* * * "Restrictive covenants are to be construed most strictly against the grantor and persons seeking to enforce them, and liberally in favor of the grantee, all doubts being resolved in favor of a free use of property and against restrictions." Munson v. Berdon, 51 So.2d 157, 162 (La.App. 1st Cir.1951).
`It is too well settled to require citation in support thereof that stipulations contained in restrictive covenants are stricti juris and every doubt should be resolved in favor of the unencumbered use of the property. * * *' Chexnayder v. Rogers, 95 So.2d 381, 383 (La.App. Orl.1957). To the same effect are Herzberg v. Harrison, 102 So.2d 554, (La.App. 1st Cir.1958), Lillard v. Jet Homes, Inc., 129 So.2d 109 (La.App. 2nd Cir.1961).
"In the instant case, since the building restrictions do not prohibit `home occupations,' and must be strictly limited to their provisions, and in fact specifically allow professional signs on the property (as does the zoning ordinance in the definition of a `home occupation'), it is clear that the building restrictions are in complete harmony with the zoning restrictions. Consequently, Dr. Wax could and can utilize the enclosed carport for an office.
"We must here state unequivocally that no evidence whatsoever has been introduced to show any fraud or misrepresentation whatsoever on the part of the defendant, Mr. Woods.
"Although, according to their memorandum, plaintiffs seem to abandon their position that they are entitled to rescission or to a reduction in the price of the Bristol Place property because of the alleged noise to which Dr. Wax claims to be unusually sensitive, we must state that plaintiffs did not substantiate their position by a preponderance of the evidence. However, whether the area was or was not noisy is of little importance in reaching a decision in this particular case. The evidence shows that 2200 Bristol Place was fully furnished as a model home, ready for immediate occupancy. Mr. Woods requested that Dr. Wax live in the house, free of charge, so as to make his own observations as regards noise in the neighborhood. Dr. Wax was obligated to make that inspection. He cannot now complain of any alleged noises. In the case of Pike v. Kentwood Bank, 146 La. 704, 83 So. 904 (1919), the plaintiff was denied relief because of his failure to inspect the purchased property, the court holding:
`As to the alleged fraud on the part of the bank and its agent in reference to the value and worth of the land, and the uses to which it had been and might be put, these are not such misrepresentations as to cause the contract of sale to be set aside. All of these matters could have been verified by an inspection of the land, *336 which was accessible to the plaintiff at all times.' 83 So. at 905.
"And in addition to having the right to have lived a week or ten days in the Bristol Place property, Dr. Wax testified that he visited the house and drove around the area on seven or eight occasions.
"Furthermore, the evidence adduced by the defendant conclusively shows that the defendant made no representation that the area was free from noise; even had representations been made, the plaintiffs must be denied recovery for their failure to make their own inspection, as they were given the opportunity to do. In Great Eastern Oil & Refining Company v. Bullock, 151 La. 209, 91 So. 680 (1922), the court held that the rule of misrepresentation of a fact:
`* * * is not applicable where the purchaser is in a position to find out for himself whether the representation of the vendor be true.' 91 So. at 681.
"And this is clear under the wording of the Civil Code itself, for Article 2521 provides:
`Apparent defects, that is, such as the buyer might have discovered by simple inspection, are not among the number of redhibitory vices.'
"The inspection required is the same as that of a reasonable, prudent man. In Brown v. Dauzat, 157 So.2d 570 (La.App. 3rd Cir. 1963), the court held:
`The buyer may not, however, recover for defects discoverable by simple inspection at the time of the sale by a reasonably prudent buyer acting under similar circumstances. * * *' 157 So.2d at 573.
"Plaintiffs in this case are barred from obtaining a reduction in the purchase price or a rescission on the ground of the alleged noise, because, not only were they given the right to live in the house, but any reasonably prudent man by a simple inspection of the neighborhood and the surrounding area could have discovered any noises of which the plaintiffs now complain. If there was any unusual noise in the area, plaintiffs' own negligence and inattention to the matter bars complaint by them at this time. The duty to investigate noise was even more pronounced as regards these plaintiffs, than ordinarily would be the case, because they alleged specifically that Dr. Wax was more sensitive to noise than the average man.
"In view of the above findings, it will be unnecessary for this Court to pass on the several other contentions or the exceptions of no cause and no right of action raised by the defendant.
"We will also not pass on the question of whether plaintiffs are entitled to recover the amount still on deposit for the completion of the `office' or any of the rights of the parties with regard to the agreement to enclose the carport. It must be noted that the work was halted at Dr. Wax's request. However, we have not been called upon in the instant litigation to determine the rights of the parties under that agreement.
"Accordingly, there will be judgment in favor of the defendant, Mr. Vernon B. Woods, and against the plaintiffs, Anita Tully, wife of and Dr. Harry Wax, dismissing plaintiffs' suit at their costs."
The judgment appealed from is affirmed at appellants' cost.
Affirmed.