KNOLL, Justice.*
1 ,This mineral rights case presents seminal issues concerning our civilian doctrine *796 of error and the reformation of written contracts for errors vitiating consent. It arises out of an extension of a three-year primary term oil and gas lease, covering 1805.34 acres in the southern part of Cad-do Parish, to four and one-half years. Plaintiffs, Cynthia Fry Peironnet (“Peiron-net”), Elizabeth Fry Franklin (“Franklin”), and Eleanor Baugnies de St. Marceaux (“Marceaux”), sued the lessee, Matador Resources Company (“Matador”), to rescind or reform the extension agreement making it applicable only to 168.95 nonpro-ducing acres. Following several preliminary partial summary judgment rulings by the District Court, the jury found in favor of the lessee for the extension of the entire 1805.34 acres upon a showing of no mutual error. On summary judgment, the District Court then held the lease had been extended beyond the primary term by continuous drilling operations. The Court of Appeal affirmed in part and reversed in part, reforming the lease to extend the term for the 168.95 acres only based on plaintiffs’ unilateral error and judicially suspending the running of the lease for 220 days following the rendition of judgment. We granted writs to address the ^correctness vel non of the Court of Appeal’s ruling on error. Peironnet v. Matador Resources Co., 12-2292, 2377 (La.1/11/13), 106 So.3d 541, 542. For the following reasons, we find plaintiffs are precluded from rescinding the agreement based on “inexcusable error.” We also find no manifest error in the jury’s factual conclusions on the issue of mutual error, nor do we find the District Court erred in its ruling on lease maintenance through continuous drilling operations. Accordingly, we reverse the judgment of the Court of Appeal and reinstate the District Court’s judgment in its entirety.
FACTS
Plaintiffs are owners of an undivided five-sixths interest in large tracts of land in Caddo Parish.[1] Pamela Jeter Comegys (“Comegys”), who owns the remaining one-sixth interest, is not a plaintiff herein. On June 22, 2004, plaintiffs and Comegys executed an oil and gas lease (“Lease”) to Prestige Exploration, Inc. (“Prestige”), an independent landman group. The Lease was for a three-year primary term and covered 1805.34 acres of land in the Elm Grove/Caspiana Field, ending on June 22, 2007. The initial bonus for the Lease was calculated on a total acreage basis at $100 per acre.
The ownership interests of two plaintiffs, Peironnet and Franklin, were managed by Regions Bank, whose representative, Joseph E. Hand, Jr., acted on their behalf in the Lease negotiations. Prestige acquired the Lease on behalf of Matador and then assigned the Lease to Matador on September 24, 2004.
The various tracts of the Lease extended into eight governmental sections of land consisting of Sections 23, 24, 25, 26, 35, and 36 in Township 15 North, Range 12 West, and Sections 29 and 31 in Township 15 North, Range 11 West. During lathe primary term of the Lease, Matador successfully explored and developed the Cotton Valley formation[2] in five of the eight sections, providing production royalties to *797 plaintiffs for their acreage in Sections 23, 24, 25, 26, and 36. By the late spring of 2007, as the Lease approached the end of its primary term, Matador had not yet developed plaintiffs’ tracts in the three remaining sections, Section 29, 31, and 35, and the operation of the Pugh clause[3] in paragraph 7 of the Lease presented an obstacle to Matador’s maintenance of the Lease in those sections beyond the primary term. Because Matador was able to begin operations in Section 29 on June 15, 2007, with the spudding of its Peironnet 29 Well,[4] only the 168.95 acres (“168.95 acres”) in Sections 31 and 35 were still undeveloped by June 22, 2007. This dispute concerns Matador’s negotiations with plaintiffs in the spring and summer of 2007 to extend its rights under the Lease by the execution of a lease extension agreement.
Relevant herein, the Lease contained the typical habendum clause providing that, at the end of the primary term on June 22, 2007, the Lease shall extend and be maintained “for so long thereafter as oil and/or gas is produced in paying quantities from the leased premises, or land pooled therewith as herein permitted.” ^Nevertheless, modifying this extended term and providing for lease division after the primary term, the Pugh clause of the Lease provided, in pertinent part:
7. After the expiration of the primary term hereof, this lease shall remain in force and effect as to all of the lands covered thereby so long and only so long as Lessee shall conduct continuous drilling operations on the leased premises or on land pooled therewith as hereinafter provided. The term “continuous drilling operations” shall mean not more than ninety (90) days shall expire between the completion as a producer or the abandonment as a dry hole of a preceding well and the commencement of actual drilling operations for the next well.
If Lessee fails to conduct continuous drilling operations on the leased premises or on land pooled therewith, this lease shall thereupon terminate as to all of the leased premises, except as follows:
a) If Lessee has completed a well (or wells) on the leased premises or on land pooled therewith that is producing or capable of producing oil or gas in paying quantities and is included within a pooled unit (or units), then this lease shall continue in effect as to the lands covered hereby that is within the bounds of such unit (or units), but only to the depth specified herein; [“horizontal Pugh clause”]
* * *
*798 d) In each such above case the acreage around such oil or gas well so held is to be limited from the surface to the depth of 100 feet below the stratigraphic equivalent of the deepest depth drilled; provided, however, that if any governmental rule or authority prescribes or permits a spacing pattern for the orderly development of the field or allocates a producing allowable based in whole or in part on acreage per well, then any acreage retained hereunder may include as much additional acreage as may be so prescribed, permitted or allocated, but only to the depth herein specified; [“vertical Pugh clause”]
* * *
f) It is the intention of the parties hereto that upon the cessation of continuous drilling operations by Lessee upon the leased premises pursuant to this Paragraph 7, each such area containing a well producing or capable of producing oil or gas in paying quantities shall be treated as constituting a separate lease, and neither production from nor operations on any such area shall maintain this lease in force as to any other area, [“divisibility provision”]
The Lease defined “actual drilling operations” in Section 8:
8. Whenever used in this lease, the words “drilling operations” or “operations” shall mean operations for and any of the following: actual pad construction, drilling, testing, completing, reworking, recompleting, deepening, sidetracking, plugging back or repairing of a well in search for or in an endeavor to obtain production of oil or Lgas. The words “actual drilling operations” shall mean having the bit in the ground and rotating same.
Additionally, Section 9 contained a voluntary pooling clause, which provided:
9. Lessee is hereby granted the right to pool or unitize the leased premises ... with any other land ... for the production of oil and gas from vertically drilled wells, (but not from horizontal drainholes without Lessor’s specific written consent), when in Lessee’s judgment it is necessary or advisable to do so in order to properly develop and operate said leased premises or to promote the conservation of oil and gas.... Lessee shall file written unit designations in the parish in which the leased premises are located, and shall forward to lessor a copy of such unit designation.
Consequently, in May 2007, when Matador began negotiations with the plaintiffs to extend the Lease, there existed the potential the undeveloped acreage in Sections 31 and 35 would be affected by the division of the Lease described in the horizontal Pugh clause, causing Matador to lose its lease rights for those sections. Furthermore, the undeveloped depths below the Cotton Valley formation in the producing sectional units (“Deep Rights”) would also then be released from the coverage of the Lease in accordance with the vertical Pugh clause.
This prompted Kevin Donahue, a land manager at Matador, to contact Mac Guar-ino, the owner of Prestige and Coastal Land Services, Inc.,[5] and hire his companies to obtain an extension of the Lease. Subsequently, Guarino appointed Russell Mouton as the lease broker in charge of the negotiations.
*799 In early May 2007, Mouton called Hand who referred Mouton to John Moore, Regions’s employee and then manager of Peironnet’s and Franklin’s property interests. Mouton testified he told Moore he “was extending a lease, the primary term of a lease for one year which contained 1805.34 acres.” According to Moore, Mouton called and stated “the Matador leases were expiring and they — he |fineeded to extend the 168.95 acres.” Mouton also called Marceaux, the unrepresented lessor, and discussed an extension of the Lease. Marceaux testified Mouton told her:
the lease was going to be coming up and there were certain sections of the property that had not been drilled — or “spudded” is what he said-and they needed to extend the lease on those two pieces of, those two sections, and that was 168.95 acres.
After these initial contacts, Moore and Marceaux each received a follow-up letter dated May 15, 2007, from Mouton. The caption of both letters read:
Oil, Gas and Mineral Lease Extension Section 35, T15N-R12W and Section 31, T15N-R11W Caddo Parish, Louisiana
The letters first identified the Lease reciting its coverage of “1805.34 acres.” Thereafter, the following offer was extended:
Note that the acreage they leased in Sections 23, 24, 25, 26, and 36 are situated within current producing units operated by our client, Matador Resources Company. The subject Oil, Gas and Mineral Lease will expire on June 22, 2007 as' to all acreage situated outside of currently producing units, being those lands laying in Sections 29 and 31 in Township 15 North, Range 11 West and Section 35 in Township 15 North, Range 12 West. We have scheduled to drill another well on your property situated in Section 29, Township 15 North, Range 11 West and expect that this well will be spudded in prior to the lease expiration date. However, we will need more time under the lease for us to develop their acreage in Sections 31 and 35.
Accordingly, we are hereby requesting that they extend the existing lease for an additional one (1) year period which •will allow us the time needed to develop this acreage. Enclosed herewith please find an Amendment of Oil, Gas and Mineral Lease (Extension of Primary Term) which will serve to add one (1) year to the primary term of the subject lease. The property in Sections 31 and 35 total 168.95 acres. Since we are extending the lease by one (1) year we will pay 1/3 of the original bonus or $33.34 per net acre owned.... to extend this lease for the one (1) year period.
In the event we do not spud our well in Section 29 prior to the expiration date of the lease, we will then send ... an additional amount ... as payment for the 358.90 acres in that Section as well. [“May 15 Letter”].
|7As indicated, each of the letters from Mouton contained a written lease amendment (“Extension Agreement”). These forms, which Mouton provided in May, were in all respects identical to the instrument ultimately executed by plaintiffs in August 2007, except the time for the extension was finally negotiated at eighteen months instead of one year. Thus, the Extension Agreement, as first revealed in May and later executed in August, provided:
WHEREAS, an Oil and Gas Lease (hereinafter referred to as “said Lease”) was executed in favor of Prestige Exploration, Inc., as Lessee, by Cynthia Fry Peironnet, Elizabeth Fry Franklin, *800 Pamela Jeter Comegys and Eleanor Baugnies de St. Marceaux, as Lessor(s), dated June 22, 2004, and recorded in Book 8703, Page 208, under Entry No. 1935029, records of Caddo Parish, Louisiana, reference being made to said Lease for a full description of the lands covered thereby and for all other purposes; and,
WHEREAS, said Lease is now owned by Matador Resources Company; and, WHEREAS, said Lease provides for a primary term of three (3) years, commencing on June 22, 2004; and, WHEREAS, it is the mutual desire of Lessor(s) and Lessee to amend said Lease to extend the primary term of said Lease for an additional eighteen (18) month period, from three (3) to four (4) years and six (6) months, commencing on June 22, 2004.
NOW THEREFORE, for and in consideration of the payment of TEN DOLLARS ($10.00) together with other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is agreed as follows:
There shall be deleted from the Paragraph “2.” of said Lease, the words and figures “Three (3) years,” and substituted in their place, the words and figures “Four (4) years and six (6) months.” It is expressly understood that by this amendment, the primary term of said Lease is to be extended for an additional eighteen (18) month period, from its original three (3) year primary term to Four (4) year and six (6) month primary term.
Except as amended hereby, said Lease shall remain unchanged, and for the consideration above recited: (a) Lessor and Lessee do ratify, confirm, and adopt said Lease, as hereby amended, and acknowledge that the same is valid, subsisting and in full force and effect; and (b) Lessor does hereby grant, lease and let the lands ^described in said Lease to Lessee, its successors, subles-sees and assigns, upon all and singular the terms and provisions of said Lease, as amended hereby.
Due to Mouton’s low offer of $33 per acre, Moore and Marceaux turned down this initial offer without reading the attached proposed form for the Extension Agreement. Yet, they stated they read the letter and understood it to mean Matador was seeking to extend only the 168.95 acres in the nonproductive sections. Mar-ceaux explained this conversation and letter were the extent of her negotiations with Prestige. She deferred to Regions and more specifically Hand’s advice, stating she sent the letter to Hand to review and told him the extension was only for the 168.95 acres. Ultimately, she signed the agreement because Hand said it was “okay.” Hand, however, denied any recollection or involvement in the extension negotiations.
Upon request, Mouton sent Moore a letter on June 11, 2007, containing a plat of the acreage Matador sought to develop. The plat had previously been provided to Marceaux. Aside from the additional inclusion of Section 29 in the description of the sections, this letter contained the same caption as previously contained in the May 15 Letter. The plat had Sections 31 and 35 color-coded in a brownish-red color and Section 29 color-coded in a blue, “indi-cat[ing] it would probably be spudded in time.”
In addition, the letter to Moore stated: After speaking to you June 8 by phone, I am sending you a highlighted plat you requested to show the lands we are interested [sic] renewing situated in Section 35 in Township 15 North, Range 12 West and Sections 29 and 31 in Township 15 North, Range 11 West in Caddo *801 Parish, Louisiana. The subject Oil, Gas and Mineral Lease will expire on June 22, 2007 as to all acreage situated outside of currently producing units. We have scheduled to drill another well on the Peironnet, et al property situated in Section 29, Township 15 North, Range 11 West and expect that this well will be spudded in prior to the lease expiration date.
| sBased on the plat, the letters, and representations from Mouton, plaintiffs testified they believed Matador was only seeking an extension of the primary term for the 168.95 nonproductive acres. Nevertheless, on cross-examination, Moore was asked about the implication from the proposed written form, with its reference to the “full description of the lands covered” by the Lease, that the extension included the “entire 1805 acres, all acres, all depths,” to which Moore replied:
Well, in that lease there was a horizontal severance clause so you’re asking a legal question but it was thought by me at the time that beyond the primary term of the lease that the deep rights would be open. We’re here because of what this document says, and I can answer your question and say, yes, it would extend the base lease, but that was not the intent of the parties. If I had authored it, it may have read quite differently but I did not author it. I did sign it.
As previously indicated, Mouton testified he told Moore and Marceaux he wanted to extend the Lease for all acreage, but he admitted the proposed extension’s effect on the Deep Rights was not specifically discussed with either. As attempted impeachment of that testimony, plaintiffs introduced a copy of a June 18, 2007 email from Moore to Mouton stating he would be out of town. On the copy, Mouton wrote he “told [Moore] well is spudded in 29 and only dealing with 168 acres.” That same day, Mouton’s notes indicate he discussed with Comegys, the other unrepresented lessor, her request to limit the extension to only the 168.95 nonprodueing acres. Mouton later conveyed to Comegys Matador’s refusal to limit the acreage subject to the extension. Shortly thereafter, Mouton left Prestige.
According to Moore, Donahue was the next person to contact him regarding the extension. While Donahue initially made the same $38.34 per acre bonus for the 168.95 acres, he eventually increased the amount to $75 per acre. Donahue’s deposition testimony was introduced at trial, but his testimony did not mention the details of any conversations or negotiations with Moore. Additionally, Donahue left Matador on June 28, 2007, before the extension was executed.
ImOn August 22, 2007, Guarino sent Moore another offer and the written form for the Extension Agreement with the caption:
Amendment of Lease (Extension of Primary Term)
Lands of Cynthia Fry Peironnet, et al.
Matador Resources Company (Elm Grove Prospect)
Caddo Parish, Louisiana
The letter stated an amendment was attached for review and execution “which will serve to extend the primary term under the Cynthia Fry Peironnet, et al. lease dated June 22, 2004 for an additional eighteen (18) month period. Also enclosed are checks made payable to Cynthia Fry Peir-onnet and Elizabeth Fry Peironnet [sic], in the amounts of $4,224.00, as payment of the consideration agreed upon for the extension of the lease.” This offer for Peir-onnet’s and Franklin’s interests reflected a per acre amount greater than the initial *802 $38.34 per acre offer,[6] and the memo line on the checks stated they were for “Lease Extension (OGML dtd. 6-22-04).” Because Marceaux owned only a one-sixth interest, she received $2,111.85, and the memo line on her check stated it was for “OGML dtd: 6/22/04; 168.95 acs. (lease ext.).”[7]
Because he had last communicated with Donahue, Moore testified he called Guari-no to make sure the terms were the same. Guarino’s recollection was he called Moore. In keeping with Marceaux’s testimony, Guarino testified he never spoke to Mar-ceaux. According to Moore’s testimony, Guarino
told [him] it was for 168.95 acres and he said that the only thing that was different was that the term of the extension had been changed from 12 months to 18 months. And I went on to ask him about how he arrived at the check amounts just to be sure that it was calculated out and we walk — we discussed that briefly but I multiplied $75 an acre times 168.95 and then times their proportionate interest and got those same check amounts that he referenced in the letter.
In Guarino testified he told Moore:
“Look, this has been going on for three months.” I said, “I would like to try to finalize this extension.” And I told him, I said, “Look, I do have authority to go ahead and pay you $75 an acre for the acreage outside of the existing production.” But more importantly I tried to explain the whole situation to him. I told him I said, “John, look, you know, Matador has been a good operator out here.” I said, “They’ve drilled several wells for the Peironnets. The Peiron-nets are getting royalties from those wells.” I said, “We’ve been a good operator; don’t you agree?” And he agreed that we’ve done a lot of good for the family. And I said, “As a result shouldn’t you give us a little concession here and let’s try to get this deal done on the terms presented.” And he agreed to do that and soon thereafter is when the amendment got executed.
Both Moore and Guarino testified they did not discuss the Deep Rights, but Guarino stated his intent was to “extend the whole lease,” an intention he thought was clear through the written form of the Extension Agreement, which he and Prestige had drafted. On August 23, 2007, Moore express mailed the executed Extension Agreement back to Guarino. Moore’s reply, which contained the same caption as Guarino’s letter — Amendment of Lease (Extension of Primary Term) — stated: “[e]nclosed is the executed Amendment of Oil and Gas Lease which extends the primary term under the Cynthia Fry Peiron-net, et al. lease dated June 22, 2004 for an additional eighteen (18) months.”
The question of the Extension Agreement’s effect on the Deep Rights came into focus with the announcements in early 2008 regarding the discovery of the productive potential of the Haynesville Shale formation in south Caddo Parish due to successful horizontal drilling techniques.[8] After receiving notice of Matador’s intent to create seven units in order to drill to the Haynesville Shale, Franklin and Peir-onnet filed suit against Matador on May *803 15, 2008, claiming error in the Extension Agreement and seeking damages and attorney’s fees. Peironnet and | ^Franklin sought to rescind the Extension Agreement (1) as a product of unilateral error on the part of Moore, (2) based on Moore’s and Regions’s lack of authority to enter into the agreement, (8) as a donation in invalid form, (4) for lack of consideration, (5) failure of cause, (6) fraud, and (7) unjust enrichment. In the alternative, they sought to reform the Extension Agreement to affect only Sections 31 and 85 in conformity with the mutual intent of the parties under a theory of mutual error or ambiguity in the Extension Agreement. Also, on May 15, 2008, Franklin and Peir-onnet filed a notice of lis pendens in the Caddo Parish records citing the suit caption and the Extension Agreement.
On June 6, 2008, after the lis pendens was filed, Matador assigned its rights in the Lease below the Cotton Valley formations to Chesapeake Louisiana, L.P. (“Chesapeake”). Thereafter in July and August 2008, Peironnet, Franklin, Come-gys, and Marceaux granted to Petrohawk Properties, L.P. (“Petrohawk”), oil and gas leases over their 1805.34 acres to all depths.
Comegys filed a petition of intervention on August 21, 2008, asserting claims against both Matador and Chesapeake. On December 3, 2008, Peironnet and Franklin filed an amended and supplemental petition, adding Marceaux as an additional plaintiff and Chesapeake and Prestige as additional defendants.
In 2009, Matador filed several motions for partial summary judgment, requesting dismissal of certain causes of action and issues and seeking to establish the Extension Agreement as written was unambiguous. Chesapeake and Prestige ultimately joined Matador in the motions for partial summary judgment. In response, the plaintiffs also filed a motion for partial summary judgment regarding reformation of the lease extension. Prior to the hearing on these motions, Comegys settled her lawsuit with the defendants.
11sThe hearing on the partial summary judgment motions was held on September 8, 2009. At this hearing, the District Court granted the defendants’ motions, dismissing several causes of action or issues asserted by the plaintiffs, including ambiguity of the Extension Agreement and unilateral error. The only issues the District Court did not dismiss involved mutual error, fraud, and plaintiffs’ claim regarding continuous drilling operations for lease maintenance.
On November 25, 2009, Petrohawk intervened in the suit, requesting declaratory relief for the recognition of its leases from the plaintiffs and Comegys. Essentially, Petrohawk argued it has an interest in seeking rescission and/or reformation of the Lease and the Extension Agreement based upon its lease rights.
Through various other hearings, the District Court further limited the scope of the trial. In granting a motion for partial summary judgment, the District Court held that, according to the 90-day continuous drilling operations provision in the Pugh clause, the Lease “was maintained in its entirety until November 6, 2007-90 days after the completion of the Peironnet 29 No. 1 Well by Matador.” In addition, the District Court ruled Petrohawk did not have the right to assert Comegys’s previously asserted cause of action for reformation of the Extension Agreement.
Due to the extensive record and possibility for. confusion, the District Court separated the trial into three phases. In phase one, the jury addressed whether mutual error or fraud existed so that the Extension Agreement might be reformed *804 or rescinded. The second phase involved the plaintiffs’ and Petrohawk’s alternative claim the Lease expired on or after December 22, 2008, due to Chesapeake’s failure to conduct continuous drilling operations. Finally, if the jury found in plaintiffs’ favor, phase three would adjudicate the plaintiffs’ claims for monetary damages.
| uThe five-day jury trial began in September 2010. In addition to the above evidence of the parties’ negotiations, plaintiffs presented the expert testimony of Robert Todd Fontenot concerning the practice and custom of the per-acre bonus calculations for the extension of mineral leases. On cross, Fontenot conceded the parties could agree to any consideration, although per-acre bonuses were the norm. After presentation of the plaintiffs’ case, the parties stipulated the plaintiffs did not adequately prove fraud, and the District Court granted defendants’ unopposed motion for directed verdict on that issue.
In their case in chief, the defendants presented testimony regarding the ability of contracting parties in the negotiation of lease extensions to agree to any consideration, including no consideration at all, merely on the promise to drill. Defendants also established the Lease in question was one of around ten leases in the same field Matador sought to extend in the middle of 2007, and for all the leases in production, Matador offered the same consideration on a per nonproducing acre basis, reasoning the cost expended and royalty production on the producing tracts constituted more than sufficient consideration for the extension of the remaining acreage.
At the close of defendants’ case, the District Court, pursuant to the instructions provided by the parties, charged the jury only on the claim of mutual error. In a single interrogatory, the jury decided plaintiffs had not proven “mutual error requiring the lease extension be reformed to 168.95 acres.”
After a hearing on December 18, 2010, for the second phase of the case, the District Court held production activity involving the Haynesville Shale served to extend the Lease beyond the end of the extended primary term of December 22, 2008. Thus, the District Court ruled the Lease was still valid and effective as to all acreage and depths.
11fiOn appeal, the Court of Appeal, Second Circuit, affirmed the District Court’s finding the Extension Agreement was unambiguous as written, but found legal error in the District Court’s instruction to the jury on reformation of written contracts to correct vices of consent. Peiron-net v. Matador Resources Co., 47,190 (La. App. 2 Cir. 8/1/12), 103 So.3d 445. Specifically, it found:
In this case, the jury charge did not inform the jury that even though the Extension Agreement unambiguously extended the lease rights for 1805.34 acres, including the Deep Rights, the written contract could be reformed or varied to correct a vice of consent proven under Article 1949. Neither the Civil Code’s definition of cause for one’s contract under Article 1967, nor Article 1949’s measure of error affecting a party’s cause for the contract was given to the jury for application in considering the alleged vice of consent in this case. We find that this erroneous charge without the substance of Articles 1967 and 1949 misled the jury concerning the proper law for this reformation action. This prevented the jury from properly dispensing justice.
Id. atp. 36,103 So.3dat467.
In so holding, the appellate court reasoned the 1984 Revision of the twenty- *805 seven articles on error in the Civil Code of 1870 (“1984 Revision”) resulted in a singular codal definition of error as a vice of consent in La. Civ.Code art.1949, which is “unilateral in nature” and could subject a contract to reformation under the codification of the parol evidence rule in La. Civ. Code art. 1848:
In summary, the reformation action addressed under Article 1848 requires a showing of a “vice of consent,” which the article does not limit to “mutual error.” Revision Comment (d) of Article 1949 shows that “as an alternative” to total rescission, reformation of the written contract affected in part by error under Article 1949 is the remedy to carry out the common intent of the parties. The comment therefore ties Article 1848’s rule for the reformation of a written act to the “vice of consent” of error addressed by Article 1949.
Id. at p. 35, 103 So.3d at 466. Under the appellate court’s interpretation, the concept of mutual mistake would fall under the codal provisions on cause, La. Civ.Code arts.1966 and 1967, and would nullify the obligations of both parties, not on a vice of consent, but for lack of cause. However, because plaintiffs’ petition set 11fiforth allegations of mistaken belief or error on their part of which defendants should have been aware, their claim sounded in error vitiating consent; therefore, the appellate court reasoned, the District Court’s summary judgment on the issue of unilateral error improperly excluded from the jury’s consideration the fundamental unilateral measure of error in La. Civ.Code art.1949.
In light of this perceived legal error, the appellate court reviewed the record de novo, finding clear and convincing, objective evidence “(1) that the cause for Plaintiffs’ obligation granting extended lease rights to Matador was to receive payment on a per acre basis and was limited to their rights in the 168.95 Acres; and (2) that Matador should have known Plaintiffs’ conveyance of lease rights was intended to be limited to the 168.95 Acres so that Plaintiffs were in error in their execution of the 1805.34-acre Extension Agreement,” concluding:
The principal evidence supporting both conclusions rests on objective evidence originating directly with Matador. Its written correspondence did not state that expiration of the Lease rights after the primary term would occur “as to all acreage situated outside of the currently producing units” and the Deep Rights underlying those units. Only the quoted reference to the 168.95 Acres was called to Plaintiffs’ attention.![9]] Second, Matador’s calculation and payment of the renewal bonus proceeds, its counterpart obligation in the economic exchange, was limited only to the 168.95 Acres, the rights to which were extended on the customary per acre basis of $75/aere. The error is therefore demonstrated because Plaintiffs’ obligation extending the lease rights to all 1805.34 acres entailed only a corresponding obligation on the part of Matador to pay for *806 the 168.95 Acres and not 117the extended Deep Rights. Therefore, in the application of Articles 1848 and 1949 for the assertion of the vice of consent of error, our conclusions do not rest merely on an examination of Plaintiffs’ subjective will and intentions not to renew and extend the Deep Rights, but on the consideration of these objective facts of Matador’s actions. These objective facts are clear and convincing evidence of error under the test of Article 1949.
Id. at pp. 40 — 41,103 So.3d at 469.
Accordingly, the appellate court reversed the judgment insofar as it determined the Deep Rights were extended by the Extension Agreement and remained subject to the Lease and then reformed the Extension Agreement to include only plaintiffs’ rights in the 168.95 acres. It also judicially extended the primary term of the Lease regarding the 168.95 acres for 220 days following the finality of its judgment, reasoning the plaintiffs’ suit and their top leases, granted and recorded in favor of Petrohawk, represented a disturbance of the lease rights.
Finally, the appellate court affirmed the District Court’s partial summary judgment dismissing Petrohawk’s claim for lease rights to Comegys’s one-sixth interest, reasoning that, when Comegys was dismissed with prejudice from the suit in October 2009, the notice of lis pendens in the public record ended. Because Petro-hawk was not a party to the suit at that time, it could not assert lis pendens in October 2009 to prevent Chesapeake’s recorded rights, obtained from Matador in 2008, from finding protection under the public records doctrine. The appellate court then remanded the case to the District Court for the remaining issues concerning plaintiffs’ damage claims and any other matters reserved by the parties in advance of the jury trial.
Both defendants and Petrohawk sought writs from this Court, raising several assignments of error. Defendants challenged the appellate court’s reformation of the unambiguous lease extension for plaintiffs’ unilateral error, whereas Petrohawk challenged the appellate court’s application of the judicial extension doctrine as 118well as the ruling on its right to assert Comegys’s one-sixth interest. Because our resolution of defendants’ challenge to the reformation of the parties’ contractual agreement is dispositive and all the issues raised therein sound in contract, we begin with the basic tenets of our law on contracts contained in our Civil Code.
DISCUSSION
Under our Civil Code, a contract is defined as “an agreement by two or more parties whereby obligations are created, modified, or extinguished.” La. Civ.Code art.1906. “A contract is formed by the consent of the parties established through offer and acceptance.” La. Civ.Code art. 1927. It has “the effect of law for the parties and may be dissolved only through the consent of the parties or on grounds provided by law.” La. Civ.Code art.1983.
“A contract is null when the requirements for its formation have not been met.” La. Civ.Code art.2029. When it violates a rule of public order, as when its object is illicit or immoral, a contract is absolutely null. La. Civ.Code art.2030. However, when it violates a rule intended for the protection of private parties, a contract is merely a relatively nullity and may be confirmed. La. Civ.Code art.2031.
When the law prescribes special formalities for a contract, the same formalities are required for an offer or acceptance intended to form that contract. La. Civ.Code art.1927; Barchus v. Johnson, 151 La. 985, 986, 92 So. 566, 566 (1922). Contracts involving the lease of mineral rights as a *807 transfer of incorporeal immovables must be in writing as prescribed by law, either by authentic act or by act under private signature, and so, therefore, must an offer and acceptance of said lease. La. Civ. Code art. 1839 (“A transfer of immovable property must be made by authentic act or by act under private signature.”); La.Rev. Stat. § 31:18 (“A mineral right is an incorporeal immovable.”). “When the law requires a contract to |19be in written form, the contract may not be proved by testimony or by presumption, unless the written instrument has been destroyed, lost, or stolen.” La. Civ.Code art. 1832. Notwithstanding, while “[t]estimonial or other evidence may not be admitted to negate or vary the contents of [a writing], ... in the interest of justice, that evidence may be admitted to prove such circumstances as a vice of consent....” La. Civ.Code art. 1848; Hamischfeger Sale Corp. v. Stern-berg Co., 179 La. 317, 327, 154 So. 10, 13 (1934).
“Consent may be vitiated by error, fraud, or duress.” La. Civ.Code art.1948. However, “[e]rror vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party.” La. Civ. Code art.1949; see also La. Civ.Code art. 1967; La. Civ.Code arts. 1823, 1824, 1826 (1870); Marty et Raynaud, Droit civil— Les obligations, Part I, at 111-112 (1962). Cause is the reason why a party obligates himself, and without a lawful cause, an obligation cannot exist. La. Civ.Code arts. 1966 and 1967.
As reflected in our jurisprudence and codified in the 1984 Revision, error, which vitiates consent, can manifest itself in two ways: mutually, ie., both parties are mistaken, or unilaterally, ie., only one party is mistaken. However, in both situations, the error for which relief may be granted (1) must affect the cause of the obligation, and (2) the other party must know or should have known “the matter affected by error was the cause of the obligation for the party in error; that is, that it was the reason he consented to bind himself.” See La. Civ.Code art.1949, Revision Comments — 1984, cmts. (b) & (c) (West 2012). In other words, both parties can individually be mistaken, in which case both parties are clearly aware the matter in error was the cause of their mutual obligations, thus vitiating the | ^consent 0f both parties; or one party can be mistaken and that mistake will vitiate consent if the other party knows or should have known.
In a civilian context, the granting of relief differs depending upon whether the error is bilateral or unilateral:
The granting of relief for error presents no problem when both parties are in error, that is, when the error is bilateral. When that is the case the contract may be rescinded, as when the parties misunderstood each other at the time of contracting {Lyons Milling Go. v. Cusi-mano, 161 La. 198, 108 So. 414 (1926)); or when they were misinformed because of the error of a third party {Calhoun v. Teal, 106 La. 47, 30 So. 288 (1901)). As an alternative, the instrument that contains the contract may be reformed in order to reflect the true intent of the parties. See Wilson v. Levy, 234 La. 719,101 So.2d 214 (1958); Kolmaister v. Connecticut General Life Insurance Company, 370 So.2d 630 (La.App. 4th Cir.1979).
When only one party is in error, that is, when the error is unilateral, there is theoretically no meeting of the minds, but granting relief to the party in error •will unjustly injure the interest of the other party if he is innocent of the error. Louisiana courts have often refused relief for unilateral error for this reason. *808 See Hello World Broadcasting Corp. v. International Broadcasting Corp., 186 La. 589, 173 So. 115 (1937); Kirkland v. Edenbom, 140 La. 669, 73 So. 719 (1916); Scoggin v. Bagley, 368 So.2d 763 (La.App. 2nd Cir.1979). Yet, expanding the rule stated in C.C. Art. 1826 (1870), they have granted relief for unilateral error in cases where the other party knew or should have known that the matter affected by the error was the reason or principal cause why the party in error made the contract. See Marcel-lo v. Bussiere, 284 So.2d 892 (La.1973); Jefferson Truck Equipment Co. v. Guar-isco Motor Co., 250 So.2d 211 (La.App. 1st Cir.1971). As expressed in Nugent v. Stanley, 336 So.2d 1058, 1063 (La. App. 3rd Cir.1976): “The jurisprudence ... establishes that a contract may be invalidated for unilateral error as to a fact which was a principal cause for making the contract, where the other party knew or should have known it was the principal cause.” French courts have taken a very similar approach. See 6 Planiol et Ripert, Traite pratique de droit civil francais 209-211 (2nd ed. Esmein 1952); Ghestin, La notion d’err-eur dans le droit positif actuel 104-131 (1963); Malinvaud, “De l’erreur sur la substance,” Receuil Dalloz Sirey, Chro-nique XXXI (1972); Litvinoff, “‘Error’ in the Civil Law,” Essays on the Civil Law of Obligations 222, 242-247 (Dai-now ed.1969)....
La. Civ.Code art.1949, Revision Comments — 1984, cmt. (d) (West 2012).
As noted above, under our jurisprudence, relief is provided through either reformation or rescission. This is so because the error for which the relief is 12i granted renders the contract merely a relative nullity, which can be confirmed, reformed, or deemed never to have existed, i.e., null, by the court. See La. Civ. Code arts.2031 and 2033; see also Wilson v. Levy, 234 La. 719, 722, 101 So.2d 214, 215 (1958). In granting such relief, we are guided by the understanding that “ ‘[i]t is not the province of the court to alter by construction or to make new contracts for the parties. The duty of the court is confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to give effect to the agreements as made.’” Texas Co. v. State Mineral Bd., 216 La. 742, 751, 44 So.2d 841, 844-45 (La.1950) (quoting Moriarty v. Weiss, 196 La. 34, 198 So. 643, 656 (1940)); see also, Wiley v. Davis, 164 La. 1090, 1092, 115 So. 280, 281 (1927); Blakesley v. Ransonet, 159 La. 310, 316, 105 So. 354, 356 (1925).
Concerning reformation, this Court has long held:
‘It is an established rule of law in our jurisprudence that ‘Either party is always permitted, in a suit between the parties to a contract, to correct any error in the instrument purporting to evidence the contract, so as to make it express truly and correctly the intention of the parties,’ * * * provided the rights of third parties have not intervened. * * * The error or mistake must be mutual. * * * The burden is on the one seeking the reformation to prove the error * * * and he must carry the burden by clear, and the strongest possible, proof.’
Wilson, 234 La. at 722, 101 So.2d at 215 (quoting Reynaud v. Bullock, 195 La. 86, 196 So. 29, 34 (1940)); see also, B. Segall Co. v. Trahan, 290 So.2d 854, 858 (La. 1974); Merritt v. Hays, 237 La. 557, 562-63, 111 So.2d 771, 773 (1959). Commentator and revered member of the Louisiana Law Institute, Saul Litvinoff, further explains:
*809 When a contract is reduced to writing, an error may occur in the drafting of the instrument so that the written text does not reflect the true intention of the parties. When such is the case, upon proof that the error is mutual, that is, that neither party intended the contract to be as reflected in the writing, the court may decree the reformation of the written instrument, rather than the rescission of the contract, so l^that the writing, once reformed, will express the parties’ true intention.
In the view expressed by Louisiana courts, an action to reform a written instrument is an equitable remedy, and it lies only to correct errors in a written instrument that does not express the true agreement of the parties. The reference to the “equitable” nature of the remedy probably alludes to the fact that in the Anglo-American system, at an earlier time, a suit had to be brought in equity for reformation before an action could be started at law to enforce the contract as reformed, although today a party may seek both reformation and enforcement in the same action. Be that as it may, other Louisiana decisions have concluded that reformation finds its foundation in those articles of the Louisiana Civil Code where “equity” is used with the reference of the French equité.
An action to reform a written instrument is a personal action, even when applied to real estate, and the burden of establishing the mutual error by clear and convincing proof rests on the party seeking reformation.
Litvinoff, Vices of Consent, Error, Fraud, Duress and an Epilogue on Lesion, 50 La.L.Rev. 1, 45-46 (1989)(footnotes omitted).
Unlike reformation, which is only available upon mutual error for the explicit purpose of reforming an instrument to reflect the true intent of both parties, rescission is a remedy available for both forms of error, and our code specifically allows for rescission for unilateral error, providing the “party who obtains rescission on grounds of his own error is liable for the loss thereby sustained by the other party unless the latter knew or should have known of the error.” La. Civ.Code art. 1952. Article 1952 then provides a court with the discretion to “refuse rescission when the effective protection of the other party’s interest requires that the contract be upheld.” Moreover, our Code allows for partial rescission when a provision is rendered a relative nullity for lack of a formation requirement, such as consent or cause, when the totality of the parties’ intentions are considered. See La. Civ. Code art. 2034 (“Nullity of a provision does not render the whole contract null unless, from the nature of the provision or the intention of the parties, it can be 1^presumed that the contract. would not have been made without the null provision.”).[10]
*810 In determining whether to grant rescission, our courts have considered “whether the error was excusable or inexcusable, a distinction received by modern civilian doctrine,” granting relief when error has been found excusable, see C.H. Boehmer Sales Agency v. Russo, 99 So.2d 475, 477 (La. App.Orl.Cir.l958)(“It may be that if a prospective purchaser buys a piece of property which he desires to use for commercial purposes and it is obviously in a residential neighborhood, the duty is on him to first ascertain whether he can so use it, and if he makes an offer to purchase or purchases an option, under such circumstances, it may well be that it should be held that he should be bound by his offer, but where, as here, the use to which the property is being put justifies the belief that it is zoned unconditionally for such use, he may be relieved of his obligation on later discovering that it cannot be used by him for the purpose intended”), and refusing when error has been found inexcusable, see Watson v. The Planters’ Bank of Tennessee, 22 La.Ann. 14, 14 (1870)(“The only error alleged is in signing a written contract without reading it, believing it to contain the terms of an agreement as he had understood them, which, in the absence of any charge or proof of fraud, force or improper influences upon the part of the other contracting party, is not an error from which the law will | ^relieve him. C.C. 1818,1841”). See La. Civ.Code art.1952, Revision Comments — 1984, cmt. (d) (West 2012)(citing 6 Planiol et Ripert, Traite pratique de droit civil francais 227-229 (2nd ed. Esmein 1952); Litvinoff, “ ‘Error’ in the Civil Law,” in Essays on the Civil Law of Obligations 222, 226-269 (Dainow ed.1969); Ghestin, La notion d’erreur dans le droit positif actuel 146-165 (1963)).
We cite with approval the summary by the noted authority and reporter for the 1984 Revision, which clearly sets forth the distinction between excusable and inexcusable error:
Since finding that an error, according to the particular circumstances of a case, should be given invalidating force is the sovereign prerogative of the trier of fact, and because in the process of arriving at such finding it is inevitable to delve into the subjectivity of the party alleging error, courts will refuse rescission unless they can conclude that the error besides meeting the requirements already discussed, is also excusable, that is, that the party in error did not fail to take elementary precautions that would have avoided his falling into error, such as making certain that he was reasonably informed. Otherwise the error is regarded as inexcusable, in which case the party does not obtain relief. It is noteworthy that the same approach can be noticed in the jurisprudence of France, Louisiana and American common-law jurisdictions.
Whether an error is excusable or inexcusable should be determined in concre-to, that is, according to the circumstances surrounding a particular case, rather than according to an abstract standard. Thus, personal circumstances of the party in error, such as age, experience and profession, are to be taken into account. An error made by a professional person concerning a matter within his field of expertise would no doubt be regarded as inexcusable.
If an architect claims to have made an error when he purchased a certain tract of land because it is not legally possible to erect thereon the kind of building he had in mind, his error will be regarded as inexcusable if the seller had apprised *811 him of the existence of zoning regulations that the architect neglected to check. On the other hand, when a nonprofessional person neglects to check zoning regulations, the existence of which he was not apprised, his error concerning the zoning classification of a piece of property will be regarded as excusable, and he will be therefore entitled to the rescission of the contract whereby he bought that property. Likewise, if an experienced collector seeks to avoid the purchase of a painting that was offered to him as attributed to a certain master because it proved not to be an authentic work of that master, the alleged error will be regarded as inexcusable.
[[Image here]]
lajThe most fertile ground for the healthy growth of the notion of inexcusable error is the often-recurring situation where a party claims to have made an error that bears on a cause of his obligation but further explains that he omitted to read the writing to which the contract giving rise to that obligation was reduced. In such a context Louisiana courts have said that a party may not avoid the provisions of a written contract he signed but failed to read or have explained to him. That is so because, “Signatures to obligations are not mere ornaments.” If a party can read, it behooves him to examine an instrument before signing it, and if he cannot read, it behooves him to have the instrument read to him and to listen attentively-
It seems quite clear that, unless induced to do so by outright fraud, a party who signs an instrument without reading it thereby fails to exercise elementary prudence that, if observed, would have prevented him from making his alleged error. As such contract-making conduct cannot be excused, so the resulting error cannot be excused either.
* :|: *
It is noteworthy that, more often that not, the failure for which a party in error is to blame consists of not having advised the other party properly concerning what was expected from the contractual object, which brings close together situations where the party in error has failed to act with ordinary diligence and situations where he failed to reveal his reason for contracting to the other party. In the one and the other kind of situation, and for the one or the other reason, the party in error may not obtain rescission.
Litvinoff, 50 La.L.Rev. at 36-88 (footnotes omitted).
From this dichotomy has evolved the concept of contractual negligence as a defense to a claim for unilateral error, the parameters of which this Court set forth in Scott v. Bank of Coushatta, 512 So.2d 356, 362-63 (La.1987):
Louisiana jurisprudence is sprinkled with cases which deny relief to parties who claim an agreement should be invalidated because of unilateral error which is caused, in large part, by the complaining party’s inexcusable ignorance, neglect, or want of care. A review of this jurisprudence indicates two prominent factors in the evolution of the contractual negligence defense:
(a) Solemn agreements between contracting parties should not be upset when the error at issue is unilateral, easily detectable, and could have been rectified by a minimal amount of care.
(b) Louisiana courts appear reluctant to vitiate agreements when the complaining party is, either through education or experience, in a position *812 which renders his claim of error particularly difficult to rationalize, accept, or condone.
12ijThe contractual negligence defense was acknowledged as early as 1820 in the case of Wikoffv. Townsend, 7 Mart, (o.s.) 451 (La.1820). In that case, the defendants withheld the purchase price of a lot in New Orleans which they had bought from the plaintiff, as they contended they were placed in error as to the extent of property to be purchased by the plaintiffs agent. Although both parties agreed upon the purchase of a two hundred foot lot, the lot apparently did not equate with the boundaries pointed out by the agent. Focusing on the buyer’s shortcomings in failing to measure the lot, our predecessors refused to grant rescission:
We do not think that this is an error which vitiates the contract. The defendants understood they were purchasing a space of two hundred feet in front; they knew, or at least must be supposed to have known, what extent that was. If they wanted to satisfy themselves on that score, they might have had it measured; but, if relying on their own judgment they made any mistake, as to the real extent of the two hundred feet, they cannot plead such a mistake as an excuse.
7 Mart, (o.s.) at 452-53. See also, Watson v. The Planters’ Bank of Tennessee, 22 La.Ann. 14 (La.1870); Hebert v. Livingston Parish School Board, 438 So.2d 1141 (La.App. 1st Cir.1983); Wax v. Woods, 209 So.2d 329 (La.App. 4th Cir.), unit denied, 252 La. 467, 211 So.2d 330 (1968).
In addition to the Marsh [Investment Corp. v. Langford, 554 F.Supp. 800 (E.D.La.1982) ] decision, other Louisiana cases have rejected the defense of unilateral error where the complaining party, through education or experience, had the knowledge or expertise to easily rectify or discover the error complained of. See, e.g., Tiblier v. Family Real Estate Inc., 195 So.2d 432 (La.App. 4th Cir. 1967) (dentist); Swearingen v. Maynard, 9 So.2d 272 (La.App. 2d Cir.1942) (businessman).
In the present case, plaintiffs sought rescission for unilateral error and, in the alternative, reformation for mutual mistake. Defendants responded with motions for partial summary judgment on both allegations of error, specifically advancing the defense of contractual negligence and denying plaintiffs’ ability to establish mutual error by clear and convincing evidence. The District Court granted defendant’s motion on the issue of unilateral error, but denied the motion on mutual error. The appellate court found summary judgment was improper because plaintiffs’ petition set forth allegations of error as provided in the Code. Its ruling was based on its erroneous assumption the 1984 Revision to our Civil Code [ 27somehow revised the law on error to allow for only unilateral error as a vice of consent.
However, as Litvinoff has often explained, the revision to the relevant codal provisions did not seek to change the law, but to clarify, simplify, and codify the jurisprudential interpretations and exceptions to the existing law:
The latest revision of the Louisiana Civil Code articles on error attempted to eliminate the ambiguities latent in the earlier articles in order to improve clarity in the formulation of the law. Out of the earlier twenty-seven articles, only five contained substantial rules. Those rules have been preserved although compressed into only two new articles. Definitions and examples, which were not always clear, have been eliminated together with the articles that contained *813 them. Provisions pertaining to matters that are addressed elsewhere in the Louisiana Civil Code have been eliminated also to avoid repetition. Ambiguity and obscurity in the original articles whose substance is preserved have been removed by adoption of the conclusions reached by the Louisiana jurisprudence in interpreting those articles. It can be said, thus, that, concerning the basic framework of the doctrine of error contained in the civil code, the revision has effected no change in the law.
Litvinoff, 50 La.L.Rev. at 48-49.[11] His revision comments as well as this Court’s subsequent jurisprudence evidence the continuation of both forms of error and the remedies and defenses prescribed for each. See Duncan v. U.S.A.A. Ins. Co., 06-363, p. 15 (La.11/29/06), 950 So.2d 544, 553 (“clerical error ... can be reformed |Mto reflect the mutual intent of the parties”); Samuels v. State Farm Mut. Ins. Co., 06-0034, pp. 6-7 (La.10/17/06), 939 So.2d 1235, 1240 (“As other written agreements, insurance policies may be reformed if, through mutual error or fraud, the policy as issued does not express the agreement of the parties.”); see also Aguillard, v. Auction Mgmt. Corp., 04-2804, p. 22 (La.6/29/05), 908 So.2d 1, 17 (“It is well settled that a party who signs a written instrument is presumed to know its contents and cannot avoid its obligations by contending that he did not read it, that he did not understand it, or that the other party failed to explain it to him”).
So, while the Court of Appeal correctly found an error can only vitiate consent when it concerns a cause for the agreement about which the other party is aware or should have been aware, it erred in concluding its analysis there without examining further the various forms of error and the remedies and defenses provided by law. Therefore, it falls to this Court to determine whether summary judgment on the issue of unilateral error was appropriate as a matter of law and only then whether the trial court erred in limiting its instructions to mutual error.

Partial Summary Judgment on Unilateral Error

As this Court has previously stated, a motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or *814 part of the relief prayed for by a litigant. Schultz v. Guoth, 10-0343, p. 5 (La.1/19/11), 57 So.3d 1002, 1005; Samaha v. Rau, 07-1726, pp. 3-4 (La.2/26/08), 977 So.2d 880, 882-83; see La. Code Civ. Proc. art. 966. An issue is genuine “if reasonable persons could disagree.” Smith v. Our Lady of the Lake Hosp., Inc., 93-2512, p. 27 (La.7/5/94), 639 So.2d 730, 751 (quoting W. Schwarzer, Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact, 99 F.R.D. 465, 481 (1983)). A fact is “material” when its existence or nonexistence | Mmay be essential to plaintiffs cause of action under the applicable theory of recovery. Id.; Penal-hern Blount, 550 So.2d 577, 583 (La.1989).
A motion for summary judgment will be granted “if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that mover is entitled to judgment as a matter of law.” La.Code Civ. Proc. art. 966(B). Appellate courts review motions for summary judgment de novo, using the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Schroeder v. Board of Supervisors of Louisiana State University, 591 So.2d 342, 345 (La.1991).
In the present case, plaintiffs alleged their agent, Moore, was mistaken on the cause of the agreement — in essence he did not understand the Extension Agreement extended the entirety of the Lease — and the defendants knew or should have known of his misunderstanding. In response, defendants raised the defense of contractual negligence, demonstrating through affidavits and documentary evidence: (1) the plaintiffs could show no excuse for failing to read and understand the clear terms of the Extension Agreement, which was written “in plain English, without technical language or terms of art,” explicitly extending the primary term of the Lease from three to four and one-half years; (2) plaintiffs’ agents, particularly Moore and Hand, were self-proclaimed experts in dealing with oil and gas matters, including oil and gas leases; and (3) the original lease between the parties was executed on Regions’s own lease form and undisputably extended to all depths during the primary term.
Applying the modern civilian concept of inexcusable error as advanced in our contractual negligence defense to these undisputed facts, we find, as did the District Court, reasonable persons could not disagree the alleged error on the part [3nof the plaintiffs’ agents in this case was easily detectable and could have been rectified by a minimal amount of care, i.e., by simply reading the document and/or by requesting simple changes to the written offer before acceptance. See Scott, 512 So.2d at 362-63; see also Tweedel v. Bras-seaux, 433 So.2d 133, 137 (La.l983)(“The presumption is that parties are aware of the contents of writings to which they have affixed their signatures ... The burden of proof is upon them to establish with reasonable certainty that they have been deceived.... If a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentatively whilst this is being done.”). Moreover, it is undisputable the agents of the complaining party, Regions’s petroleum landmen, were both “through education and experience in a position which renders [their] claim of error particularly difficult to rationalize, accept, or condone.” Scott, 512 So.2d at 362-63.
As discussed earlier, the negotiations were conducted by Moore, who represented the plaintiffs, and by Mouton, Donahue, *815 and Guarino, who represented the defendants. Although Mouton initially contacted Marceaux to discuss the extension, it is obvious from her testimony she was not involved in the negotiations and deferred to Regions, specifically testifying she signed the document upon advice from Hand. Both Moore and Hand agreed Mar-ceaux deferred to the bank’s direction. While Hand denied any participation or recollection of the negotiations, taking Marceaux’s testimony as a true accounting, it is clear the various landowners were advised by certified petroleum landmen with decades of experience and by the very landman who negotiated the original lease, Hand.
Moreover, these landmen did not dispute the Extension Agreement explicitly extends the entire Lease as to all acreage and depths. The original offer sent in |s1May and the final offer accepted in August were identical except for the length of the extension, which was changed to reflect four and one-half years rather than merely four years. Moreover, although the parties never discussed the Deep Rights, it is clear, from both written offers, defendants sought to extend the entire Lease by extending the primary term for an additional eighteen months. Although the parties conceded the document could have easily been redrafted to reflect certain depths and acreage, no such discussions were ever held between the parties herein regarding any reformation. Yet, we note Comegys on her own questioned the extent of the drafted offer and requested the extension be limited strictly to the undeveloped acres, which request Matador ultimately denied. Of even more interest is Hand’s testimony that, even if the “mistake” was noticed, he suspected “no one thought it mattered at the time,” but it was undeniably the bank’s responsibility as plaintiffs’ agent to question the document.
As in all the cases wherein inexcusable error has been found, even though the plaintiffs contend their error requires rescission, we find a “sea of flags” should have been raised by these experienced landmen concerning the true extent of the agreement from the outset, namely:
(1) The language in the written agreement stating “WHEREAS, it is the mutual desire of Lessor(s) and Lessee to amend said Lease to extend the primary term of said Lease for an additional eighteen (18) month period, from three (8) to four (4) years and six (6) months, commencing on June 22, 2004;” along with
(2) The provision of the written agreement stating “Except as amended hereby, said Lease shall remain unchanged, and for the consideration above recited: (a) Lessor and Lessee do ratify, confirm, and adopt said Lease, as hereby amended, and acknowledge that the same is valid, subsisting and in full force and effect; and (b) Lessor does hereby grant, lease and let the lands described in said Lease to Lessee, its successors, sublessees and assigns, upon all and singular the terms and provisions of said Lease, as amended hereby;”
(3) The language contained in the initial letter of transmittal providing: “Accordingly, we are hereby requesting that they extend the existing lease for an additional one (1) year period which will allow us the time needed to develop this acreage. Enclosed herewith please find an
Amendment of Oil, Gas and Mineral Lease (Extension of Primary Term) which will serve to add one (1) year to the primary term of the subject lease; ” and
*816 (4) The language contained in the final letter of transmittal stating the Extension Agreement “will serve to ejc-tend the primary term under the Cynthia Fry Peironnet, et al. lease dated June 22, 2004 for an additional eighteen (18) month period.”
It follows, therefore, the plaintiffs’ failure to question the extension, to seek clarification of the acreage covered, or to even discuss the Deep Rights demonstrates an inexcusable lack of “elementary prudence” or simple diligence that now precludes their rescission of the agreement.
In light of these undisputed facts, we find the plaintiffs were precluded by law from advancing a unilateral theory of error due to their own inexcusable error, and defendants were entitled to summary judgment as a matter of law. Therefore, as summary judgment was proper, we further find the District Court did not err in instructing the jury only on the issue of mutual error.
Regarding any error in those instructions, we note trial courts are given broad discretion in formulating jury instructions, and it is well accepted a trial court judgment will not be reversed so long as the charge correctly states the substance of the law. Nicholas v. Allstate Ins. Co., 99-2522, p. 8 (La.8/31/00), 765 So.2d 1017, 1023; see also, Wooley v. Lucksinger, 09-0571, 09-0584, 09-0585, 09-0586, p. 82 (La.4/1/11), 61 So.3d 507, 574. In the present case, the District Court instructed the jury:
Because it involves rights in lands, the law requires that a mineral lease must be in writing. Any agreement or contract involving mineral rights, including any amendment to such an agreement, must be in writing. A mineral lease can be amended by a later written contract executed by the parties.
A person should use great care before signing a contract, including reading it and making sure he or she understands its provisions before signing. Once a contract is signed, there is a strong presumption that the written contract reflects the parties’ true agreement and that they made no mistake in their contract.
|SSA written contract that is clear and unambiguous should be enforced as written unless the landowners prove that the contract is the result of mutual error.
In cases of mutual mistake, an instrument may be reformed over the objection of one of the contracting parties when necessary to reflect the parties’ real mutual intent.
The Plaintiffs have alleged that the lease contract should be reformed because it contains mistakes or errors which cause the contract to contain terms which the parties never agreed to. In order to reform the contract, the Plaintiffs must prove by clear and convincing evidence that the lease agreement that was executed contains terms which neither the Plaintiffs nor Defendants agreed to. It is not enough to prove that one party did not agree to the terms of the contract as written. Instead, the Plaintiffs must prove by clear and convincing evidence that Defendant did not agree to the terms of the contract either. The error or mistake must be mutual and the evidence of mutual error must be clear and convincing. To find mutual error there must be a prior agreement not correctly put into writing.[12]
*817 Because we find these instructions “adequately provide the correct principles of law as applied to the issues framed in the pleadings and evidence and ... adequately guided the jury in its deliberation,” the District Court did not legally err in its instructions to the jury on mutual error, and we reverse the judgment of the Court of Appeal accordingly. See Nicholas, 99-2522 at p. 8; 765 So.2d at 1023; see also Wooley, 09-0571 at p. 82, 61 So.3d at 574; Wilson, 234 La. at 722, 101 So.2d at 215 (reformation for mutual error); Tweedel, 433 So.2d at 137 (presumption arising from signature); La. Civ.Code art. 1839 (transfer of immovables); La.Rev.Stat. § 31:18 (mineral rights are immovables); La. Civ. Code art. 1848 (parol evidence rule); Litvi-noff, 50 La.L.Rev. at 45 (discussion on mutual error and reformation).
| ^Having found no legal error in the District Court’s instructions, we now turn to the manifest error doctrine to review the jury’s factual conclusions on the issue of mutual error.
Manifest Error Review [10-14] In accordance with well-established law, much discretion is left to the judge or jury on determinations of fact. Guillory v. Lee, 09-0075, p. 14 (La.6/26/09) 16 So.3d 1104, 1116; Wainwright v. Fonte-not, 00-0492, p. 6 (La.10/17/00), 774 So.2d 70, 74.
[T]he reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court’s better capacity to evaluate live witnesses (as compared with the appellate court’s access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts.
Guillory, 09-0075 at p. 14, 16 So.3d at 1116-17 (quoting Perkins v. Entergy Corp., 00-1372 (La.3/23/01), 782 So.2d 606). An appellate court, in reviewing a jury’s factual conclusions, must satisfy a two-step process based on the record as a whole: there must be no reasonable factual basis for the trial court’s conclusion, and the finding must be clearly wrong. Kaiser v. Hardin, 06-2092, pp. 11-12 (La.4/11/07), 953 So.2d 802, 810; Guillory v. Insurance Co. of North America, 96-1084, p. 5 (La.4/8/97), 692 So.2d 1029, 1032. The issue to be resolved on review is not whether the jury was right or wrong, but whether the jury’s fact finding conclusion was a reasonable one. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Canter v. Koehr-ing Co., 283 So.2d 716, 724 (La.1973).[13]
|ssNotably, reasonable persons frequently disagree. Guillory, 09-0075 at pp. 15-16, 16 So.3d at 1117. However, where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous or clearly wrong. Rosell, 549 So.2d at *818 844. “[W]here there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable.” Canter, 283 So.2d at 724. Simply stated,
When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to ■ the trier of fact’s findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener’s understanding and belief in what is said. Where documents or objective evidence so contradict the witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness’s story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a fact-finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.
Rosell, 549 So.2d at 844-45 (citations omitted). With these principles in mind, we must review the record evidence and determine if the jury erred in its factual conclusions regarding mutual error.
To establish mutual error, the plaintiffs bore the burden of proving both parties were mistaken regarding the cause of their obligations as reflected in the written agreement — an eighteen month extension of the entire lease for the consideration paid. See Wilson, 284 La. at 722, 101 So.2d at 215; see also, Litvinoff, 50 La.L.Rev. at p. 45; La. Civ.Code art.1949, Revision Comments — 1984, cmt. (d)(West 2010). Following a five-day trial, the jury concluded the plaintiffs had not proven both parties were mistaken or that neither party intended |3fithe contract as written. After careful review of the evidence, we cannot say the jury manifestly erred.
As the record shows and the lower courts agreed, the Extension Agreement was clear and unambiguous, extending the primary term of the Lease from three to four and one-half years for all acreage and depths: “it is the mutual desire of Lessors) and Lessee to amend said Lease to extend the primary term of said Lease for an additional eighteen (18) month period.... Lessor does hereby grant, lease and let the lands described in said Lease to Lessee ... as amended hereby.” Moreover, all agents for defendants — Mouton, Donahue, Guarino, Cody Hubbell (petroleum landmanager with Matador), David Lancaster (Matador’s Executive Vice President, whose decision it was to get the extension), John Durham (the petroleum land manager who signed the lease for Matador), and Lawrence Foster (Prestige’s landman who obtained Mar-ceaux’s and Comegys’s signatures) — testified the extension was intended for the entire Lease, all acreage and depths. The initial letters transmitting the proposed lease extension clearly and unambiguously requested an extension of the existing Lease as did the létters transmitting the Extension Agreement for signature (from Guarino to Moore dated August 22, 2007) and the signed lease extension (from Moore to Guarino dated August 28, 2007). The written agreements themselves were drafted by defendants and distinctly reflect their intent to extend the entire Lease. Moreover, Matador’s response to Comegys’s request to limit the extension to the undeveloped acres clearly evidences Matador’s intent to extend the entirety of the lease premises.
*819 Though much is made of the shaded maps accompanying the letters and the correspondence detailing the acreage to be developed as well as the consideration given for only the nonproducing acreage and the bonus checks, the jury was charged ■with weighing the evidence and crediting the explanations provided by the | S7parties. The jury clearly credited the defendants’ explanations the maps merely reflected what acreage needed to be developed, not the acreage sought to be extended. Moreover, Moore testified the maps did not even reflect all the acreage in Sections 31 and 35,[14] clearly calling into question their reliability regarding the acreage under consideration by either party for extension.
The jury likewise credited defendants’ explanation that consideration for all of the leases Matador was seeking to extend in the Elms Grove/Caspiana Field, including the Peironnet leases, was calculated based on the acreage not in production, taking into account the monies expended and royalties already being paid on the tracts held by production. Additionally, it was undisputed that, at the time of the confection of this agreement, the shale was not commercially viable, which Hand’s suspicion “no one thought the Deep Rights mattered at that point in time” further substantiates.
Regarding the notations on the checks issued to the plaintiffs, the jury once again weighed the conflicting evidence and decided the issue in defendants’ favor. Although the Mareeaux check cites the “168.95 acs. (lease ext.),” the Peironnet and Franklin checks state they are for “Lease Extension.” Defendants explained the 168.95 notation reflected the formula employed to calculate the agreed upon consideration and was not indicative of the acreage extended — an explanation, which is consistent with their position on how consideration was calculated by the parties.
IssFinally, the jury was within its discretion to credit the written offers and the actual drafts of the agreement, all of which clearly do not limit the extension to the 168.95 nonproducing acres, over the correspondence from Mouton, particularly as he was not a party to the execution of the agreement and did not participate in the final negotiations between Guarino and Moore.
The record evidence- reasonably shows Matador intended to extend the entirety of the Lease by extending the primary term for the consideration given. Based on this evidence, the jury could reasonably conclude “mutual error requiring the lease extension be reformed” had not been proven. Thus, because the jury’s factual conclusions are reasonably supported by the record evidence, we must affirm the District Court’s ruling on the issue of mutual error.
The only issue remaining is whether the Lease was maintained beyond the extended term pursuant to the continuous drilling operations clause contained in Section 7 of the Lease, which provides:
After the expiration of the primary term hereof, this lease shall remain in force and effect as to all of the lands covered thereby so long and only so long as Lessee shall conduct continuous drill *820 ing operations on the leased premises or on land pooled therewith as hereinafter provided. The term “continuous drilling operations” shall mean not more than ninety (90) days shall expire between the completion as a producer or the abandonment as a dry hole of a preceding well and the commencement of actual drilling operations for the next well.
If Lessee fails to conduct continuous drilling operations on the leased premises or on land pooled therewith, this lease shall terminate as to all of the leased premises, except as [provided in the Pugh clauses, see infra, p. 4].
In this regard, we likewise agree with the lower court that, by operation of our well-founded law of conservation, continuous drilling operations on lands unitized |Sflwith the leased premises by orders of the Office of Conservation satisfied the defendants’ obligations under the Lease.[15]

Continuous Drilling Operations

Under the lease provisions quoted above, the Lease would remain in force and effect as to all the leased premises even after the expiration of the primary term on December 22, 2008, as long as the Lessee conducted continuous drilling operations. Moreover, to maintain continuous drilling operations, the Lessee had to commence actual drilling operations, i.e., “having the bit in the ground and rotating same,” see Lease, supra § 8, which, under the industry lexicon, is referred to as “spudding,” for a new well on the leased premises or lands pooled therewith within ninety days from the completion of a preceding well. Failure to conduct such operations would trigger the Pugh clauses, releasing the acreage outside and below the producing units. Given the monetary value of the Deep Rights in this case, the determination of whether continuous drilling operations had ended was of utmost importance to the parties. Central to this determination was the chronology of actual drilling operations after December 22, 2008:
• On December 22, 2008, Matador completed its vertical Cotton Valley well drilled on leased property in Section 26 (Peironnet 26 Well).
• On January 1, 2009, Matador spudded its vertical Cotton Valley well drilled on property unitized with the leased premises in Section 36 (Zimmerman Well).
• On February 14, 2009, Matador completed the Zimmerman Well.
• On April 27, 2009, Chesapeake spud-ded its horizontal Haynesville Shale well on property unitized with the leased premises in Section 24 (Bradway Well).
140* On July 18, 2009, Chesapeake completed the Bradway Well.
• On August 1, 2009, Petrohawk spud-ded its horizontal Haynesville Shale well on property unitized with the leased premises in Section 31 (Tigre Well).
• On November 6, 2009, Chesapeake spudded its horizontal Haynesville Shale well on property unitized with the leased premises in Section 35 (Legrand Well).
*821 • On December 7, 2009, Petrohawk completed the Tigre Well.
Significantly, the Zimmerman, Bradway, Tigre, and Legrand wells were all drilled on compulsory units formed by the Office of Conservation, not on declared units voluntarily formed by the defendants. In other words, the Commissioner of Conservation force pooled the leased premises with neighboring tracts and leases into a single unit, and the wells were drilled on lands force pooled with the leased premises. See La.Rev.Stat. § 30:9(B)(“For the prevention of waste and to avoid the drilling of unnecessary wells, the commissioner shall establish a drilling unit or units for each pool... .”)• Moreover, the Bradway, Tigre, and Legrand wells were horizontal wells drilled on units created without plaintiffs’ specific written consent. Nevertheless, all the wells were spudded within ninety days of the completion of the preceding well.
After the jury upheld the validity of the Extension Agreement, the parties submitted the issue of lease maintenance in competing motions for summary judgment. In their motion, the plaintiffs and Petrohawk contended defendants did not maintain “continuous drilling operations” as required by Section 7 in accordance with the voluntary pooling provision set forth in Section 9 of the Lease, which (1) granted the Lessee the right to pool or unitize the leased premises with any other land for the production of oil and gas from “horizontal drainholes [only] with[] Lessor’s specific written consent,” and (2) required the Lessee “file written unit designations in the parish where the leased premises were located.” According to the plaintiffs and Petrohawk, this voluntary, pooling provision [ 41 “limited the lessees’ ability to rely on operations on pooled lands to operations on declared units formed by the lessee, and as to horizontal wells, restricted pooling to situations in which the lessors had given written consent.” Thus, they argued maintenance of the Lease through continuous drilling operations involving pooled lands and horizontal drainholes required three things: (1) Lessee must drill the wells, not a third party, (2) they must be on a voluntarily declared unit, and (3) with the Lessor’s specific written consent.
Consequently, plaintiffs and Petrohawk reasoned, because defendants never declared the units and the horizontal wells were drilled on units created without the plaintiffs’ specific written consent, the Lessee’s drilling activities after December 22, 2008, did not constitute continuous drilling operations. Likewise, they argued the Tigre Well was insufficient to constitute continuous drilling operations because it was not drilled by Chesapeake, but by Petrohawk, a third party to the Lease, and therefore, the lapse of more than ninety days between the completion of the Brad-way Well on July 18, 2009, and the spud-ding of the Legrand Well on November 6, 2009, triggered both the vertical and horizontal Pugh clauses, releasing all acreage and depths outside the producing units.
However, defendants asserted their production activities involving the compulsorily unitized wells in Sections 24, 35, and 36, and the spudding on August 1, 2009, by Petrohawk of its Tigre Well, which was designated a drilling and production unit for the entirety of the Haynesville Zone in Section 31, constituted continuous drilling operations under the Lease. In this regard, defendants argued the compulsory unit orders trumped the contractual limitations of the parties regarding the drilling and unitization obligations set forth in the Lease. The District Court ruled in defendants’ favor, finding “the action of the |42Conservation Commission is dispositive and the Tigre well satisfied the continuous drilling requirements.” We agree.
*822 It is well settled under our law of conservation a unit well is deemed an operation upon and production from every lease that is part of that unit, and the Commissioner of Conservation has the plenary authority to declare drilling and production units, to force pool neighboring tracts and leases into a single unit, to designate a single well and operator for the unit, and to allocate production from the unit well to each participating tract and lease-all for the purpose of conserving resources, avoiding waste, and eliminating unnecessary wells. La.Rev.Stat. § 30:4, 9, 10. When such units are created, the operations of the designated operator constitute operations for all lessees participating in the unit, and the orders of the Commissioner creating said units supersede, supplement, replace and are incorporated in the provisions and obligations of the leases subject thereto. Delatte v. Woods, 232 La. 341, 357-58, 94 So.2d 281, 287 (1957). In this regard, the orders become the law between the parties in determining their rights and obligations:
It is firmly established in our jurisprudence that statutory authority is granted to the Commissioner of Conservation to create drilling developmental units and to integrate various tracts of various owners contained in such units, that the orders of the Commissioner supersede, supplement, replace and are incorporated in the provisions and obligations of contracts and leases relating to mineral development. LSA-R.S. 30:1 et seq. It necessarily follows that these orders become the law as between the parties in determining their respective rights and obligations.
Sec. 8(b) of Act 157 of 1940, as amended, LSA-R.S. 30:9(B), authorizes the commissioner to establish drilling units so as to prevent waste and to avoid the drilling of unnecessary wells. The unit contemplated means the maximum area
that might be efficiently and economically drained by one well, the owner of such tracts to share rateably according to their ownership. Such units constitute a developed area as long as a well is located therein which is capable of producing oil or gas in paying quantities.
The rule is too well established in our jurisprudence to require citation that the drilling and production of oil from a unitized area | .^constitutes an exercise and user of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.
As pointed out by us in Hardy v. Union Producing Co., 207 La. 137, 20 So.2d 734, and in Crichton v. Lee, 209 La. 561, 25 So.2d 229, the lessor in such cases received the same revenue as he would have received if the well had been located on his lands and the lessor of any particular tract can receive no more even if the well were drilled on the land covered by his lease.
Delatte, 232 La. at 357-58, 94 So.2d at 287.
Further expounding on this concept and its legal ramifications, we have more recently explained:
By prohibiting an individual landowner in the unit from drilling wells on their own tracts, by forcing them to share production, and by limiting the amount of hydrocarbons that can be produced, the exercise of the Commissioner’s power to unitize necessarily results in infringement on the usual rights of ownership. Unitization has also resulted in changes in the legal relationships between landowners and lessees within the unit. For instance, the inclusion of a leased tract within a unit relieved the lessee of the tract of his obligation to *823 drill a well on the leased premises. The Court in Delatte v. Woods, 232 La. 341, 94 So.2d 281, 287 (1957), relied on the established rule that “the drilling and production of oil from a unitized area constitutes an exercise and use of the mineral rights throughout the entire unit and operates as a substitute for performance of drilling obligations contained in a mineral lease covering any property or tract located within the unit.”
Therefore, we hold that the more recent legislative enactments of Title 30 and Title 31 supercede in part La.Civ. Code Ann. art. 490’s general concept of ownership of the subsurface by the surface owner of land. Thus, when the Commissioner of Conservation has declared that landowners share a common interest in a reservoir of natural resources beneath their adjacent tracts, such common interest does not permit one participant to rely on a concept of individual ownership to thwart the common right to the resource as well as the important state interest in developing its resources fully and efficiently.
Nunez v. Wainoco Oil & Gas Co., 488 So.2d 955, 963-64 (La.1986).
Under these principles, the Zimmerman Well, Bradway Well, Tigre Well, and Le-grand Well, which were all drilled on compulsory units encompassing the leased premises, were the legal and functional equivalent of wells drilled by the |44Lessees — whether as operator or not— on plaintiffs’ lease as explicitly contemplated in the orders of unitization:
The separately owned tracts, mineral leases, and other property interests within each of the units created herein are hereby pooled, consolidated, and integrated in accordance with Section 10, Title 30, of the Louisiana Revised Statutes of 1950, with each tract sharing in unit production in the proportion that the surface area of such tract bears to the entire surface area'of the unit in which it is situated. Also, all operations on and production from a unit shall be considered operations on and production from each of the separate tracts within such unit and under the terms of each of the mineral leases said tracts.
Office of Conservation Order No. 191-H-6 (emphasis added)(ereating defendants’ drilling and production units for the Haynesville Shale); see also, Office of Conservation Order No. 1145-B-8 (creating Petrohawk’s drilling and production unit for the Haynesville Shale).
Moreover, reading the continuous drilling operations clause in its proper context, it is apparent the phrase “as hereinafter provided” merely links the phrase “continuous drilling operations” to the definition that immediately follows. See Clovelly Oil Co., LLC v. Midstates Petroleum Co., LLC, 12-2055 (La.3/19/13), 112 So.3d 187 (contracts “must be interpreted in a common-sense fashion, according to the words of the contract their common and usual significance”). Nothing in Section 7, as previously cited, suggests “as hereinafter provided” is meant to limit the continuous drilling clause to situations of voluntary pooling under Section 9. Indeed, there is no reference at all in Section 7 to voluntary pooling or Section 9. Rather, the only language that follows “hereinafter provided” is the definition of “continuous drilling operations” in the very next sentence. Furthermore, the second paragraph in Section 7 sets forth the consequences of failing to conduct continuous drilling operations, but does not follow the phrase “on land pooled 14fitherewith” with *824 “as hereinafter provided.”[16] Contrarily, it simply states “[i]f Lessee fails to conduct continuous drilling operations on the leased premises or on land pooled therewith, this lease shall thereupon terminate as to all of the leased premises except as follows.... ” Thus, we find there is no proviso, whatsoever, in this clause that can be read to limit the scope of “on land pooled therewith” or to exclude compulsory unit wells from its application.
Finally, as we have previously stated, plaintiffs are entitled to their share of the production from the wells, based on their pro rata interest in the unit, just as if the well had been drilled on their Lease. La. Rev.Stat. § 30:10A(l)(a). Likewise, defendants must contribute their share of the cost of the unit wells, as if they had drilled them themselves on the Lease. La.Rev. Stat. § 30:10A(2)(non-operators who are entitled to participate in a unit well must contribute their share of drilling and operating costs.). In this regard, though the rights and interests of all the landowners trump the individual rights and interests of any given landowner — in this case, the plaintiffs — the allocation of benefits and costs recognized in the parties’ lease agreements are still preserved as contemplated by our law and the |4fipurpose of a mineral lease, ie., to develop the leased premises, is fulfilled in an efficient and economical manner for the good of the State.
Accordingly, we find the District Court did not err in concluding the production activities from the unitized wells drilled pursuant to a compulsory order of the Office of Conservation within ninety days of the completion of the preceding well satisfied the “continuous drilling operations” clause of the Lease and served to maintain the Lease in its entirety beyond the extended primary term.
CONCLUSION
In summary, we find an error vitiates consent only when its concerns the cause about which the other party knew or should have known. When this error is mutual, courts may reform or rescind the agreement to reflect the true intent of the contracting parties. When the error is unilateral, courts may rescind the contract, but rescission is not available when the *825 error is the result of the complaining party’s own inexcusable error. Based on the undisputed facts herein, the plaintiffs were precluded by law from advancing their claim of unilateral error given their inexcusable failure to read and question the unambiguous extension agreements and their agents’ experience in the oil and gas field. Because summary judgment on this issue was appropriate as a matter of law, we find the District Court did not err in instructing the jury on mutual error alone, and we reverse the judgment of the Court of Appeal finding to the contrary. Reviewing the record in its entirety, we find no manifest error in the jury’s factual conclusions on mutual error, nor do we find error in the District Court’s interpretation of the continuous drilling operations clause and application of the law of conservation. Accordingly, we affirm and reinstate the judgment of the District Court in its entirety.
DECREE
147For these reasons, we reverse the judgment of the Court of Appeal and hereby reinstate the judgment of the District Court in its entirety.
REVERSED; JUDGMENT OF THE DISTRICT COURT REINSTATED.
Retired Judge HILLARY CRAIN serving as Justice ad hoc for VICTORY, J., recused.

 Retired Judge Hillary Crain was assigned as Justice pro tempore, sitting for Victory, J., *796 recused.

. During the litigation, Peironnet transferred her oil and gas interests to the Cynthia F. Peironnet Family, L.L.C. Franklin also created a corporation, Small Fry, L.L.C., for this purpose as well. They later filed an Act of Correction in order to individually reverse/retain their claims and any damages relating to this current litigation.

. The Cotton Valley formation was unitized by the Office of Conservation for sectional units to encompass depths of approximately 10,200 feet.

. Under the provisions of our Mineral Code, La.Rev.Stat. § 31:1 et seq., a lease is considered indivisible, thus operations or production from one tract maintains the entire lease. La.Rev.Stat. § 31:114 (“operations on the land burdened by the lease or land unitized therewith sufficient to maintain the lease according to its terms will continue it in force as to the entirety of the land burdened”). Parties, however, can agree to divide the lease for purposes of lease maintenance, such that production on one tract does not maintain the lease as to all other tracts. La.Rev.Stat. Ann. § 31:114, Official Comment (West 2012). Often this is accomplished by a "Pugh” clause, which, depending on its variations, typically provides production from a unit well maintains only the area of the lease included within the unit. A unit is a defined geographic area encompassing a particular reservoir or pool of resources created to effectively drain the reservoir.

. As the record shows, the drilling of this well temporarily extended the Lease beyond the primary term, and under the "continuous drilling operations” provision, discussed in detail infra, the defendants had ninety-days from the completion of this well on August 6, 2007, to either commence drilling operations on a new well or contractually extend the Lease, otherwise the Lease would expire as to all acreage and depths not held by production.

. Coastal was actually the corporation hired to obtain the lease extension. Both Coastal and Prestige are corporations owned by Guar-ino. They employ the same agents and were stated to be virtually one and the same by the witnesses. They will both be collectively referred to as “Prestige.”

.Concerning Franklin’s and Peironnet's one-third interest, the calculation for the $4,224 each received was: 168.95 acres x $75 per acre x 1/3 = $4,223.75, rounded to $4,224.00.

. Marceaux and Comegys executed the Extension Agreement on September 7, 2007.

. The Haynesville Shale formation was also unitized on a sectional basis generally between the depths of 10,910 and 11,490 feet.

. The appellate court specifically referenced the following statements from Mouton’s correspondences:
• Written caption on May 15 Letter listing only Sections 31 and 35
• "Lease will expire on June 22, 2007 as to all acreage situated outside currently producing units.”
• "We will need more time under the lease for us to develop your acreage in Sections 31 and 35.”
• Color-coded plat prepared by Prestige "to show the lands we are interested in renewing.”
• Lease expiration after the primary term will occur "as to all acreage situated outside of the currently producing units.”
Id. atp. 38, 103 So.3dat468.

. As the comment notes: *810 La. Civ.Code art.2034, Revision Comment— 1984 (West 2012).
*809 This Article is new, but it is logically consistent with traditional concepts of motive or cause. It directs the court to consider the totality of the parties’ intentions before annulling the agreement when only a portion of it is null. The principle embodied in this Article has been approved in several contract decisions of the United States Supreme Court. See, e.g., Gelpcke v. Dubuque, 68 U.S. 221, 1 Wall. 221, 17
L.Ed. 519 (1863); Daniels v. Tearney, 102 U.S. 415, 12 Otto 415, 26 L.Ed. 187 (1880); Chicago, St. L. & N.O.R. Co. v. Pullman Southern Car Co., 139 U.S. 79, 11 S.Ct. 490, 35 L.Ed. 97 (1891); McCullough v. Virginia, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898). See also the dissenting opinion in Davis-Delcambre Motors Inc. v. Simon, 154 So.2d 775 (La.App. 3rd Cir. 1963); Pennington v. Drews, 218 La. 258, 49 So.2d 5 (1949); C.C. Art. 2123 (1870).

. See also La. Civ.Code art. 1848, Revision Comments — 1984, cmt. (a) (West 2012)(‘‘This Article is new. It does not change the law, however. It reproduces the substance of C.C. Art. 2276 (1870) and incorporates exceptions recognized by the Louisiana jurisprudence.”); La. Civ.Code art. 1949, Revision Comments— 1984, cmt. (a) (West 2012)(‘‘This Article is new. It does not change the law, however. It reproduces the substance of C.C. Arts. 1823, 1825, and 1826 (1870)”); La. Civ.Code art. 1949, Revision Comments — 1984, cmt. (b) (West 2012)("This is consistent with the principle expressed in C.C. Art. 1823 (1870),” citing Marty et Raynaud, Droit civil — Les Obligations, Part I, at 111-112 (1962)); La. Civ. Code art. 1949, Revision Comments — 1984, cmt. (c) (West 2012)("This is consistent with the definition of cause contained in revised C.C. Art. 1967 (Rev. 1984), infra, the principle stated in C.C. Art. 1824 (1870); and the jurisprudential interpretation given to C.C. Art. 1826 (1870)); La. Civ.Code art.2029, Revision Comments — 1984, cmt. (a) (West 2012)("This Article is new, but it does not change the principles articulated in the source Articles and jurisprudence.”); La. Civ.Code art.2030, Revision Comment — 1984 (West 2012)(This Article is new, but it does not change the law. It codifies the jurisprudential rule that a contract which contravenes the public order is absolutely null.); La. Civ.Code art.2031, Revision Comment — 1984 (West 2012)(‘‘This Article is new, but it does not change the law. It restates the rules of C.C. Arts. 11, 1791, 1795 and 1881 (1870)”); La. Civ.Code art.2033, Revision Comments — 1984, cmt. (a) (West 2012)(This Article is new. It does not change the law, however. The rules stated are derived in part from the Louisiana jurisprudence, and in part from the principles underlying the source articles.”).

. As previously noted, these instructions were drafted pursuant to the instructions provided by the parties. Although prior to the start of defendants' case, plaintiffs objected to the exclusion of jury charges on all of the issues dismissed on summary judgments, par *817 ticularly the ambiguity of the contract and unilateral error, on the mutual error charge, plaintiffs objected solely to (1) the inclusion of the words "strong” to described the legal presumption "the written contract reflects the parties' true intent” and "prior” as requiring an agreement before the written contract, and (2) the exclusion of their charge regarding the receipt of payment or consideration.

. This decision was superceded on other grounds by an amendment to La.Rev.Stat. § 23:1032 as recognized in Walls v. American Optical Corp., 98-0455, p. 3 (La.9/8/99), 740 So.2d 1262, 1265.

. While identifying the acreage in the plats for the jury, Moore testified:
That was located in Section 31, that being this brown-shaded area of this Township 15 North, 11 West and over here is Township 15 North, 12 West, and he wanted to extend this acreage right here, this shaded in brown. It’s kind of hard to see but that's what I understood that he wanted to extend, this and this. And for some reason this was not shaded, but that was also part of the acreage that he wanted to extend. And these three tracts added up to 168.95 acres.

. Although this issue was not raised by the parties before this Court, the issue was raised on appeal and briefed extensively in the courts below. Therefore, in the interest of justice and finality, we will resolve this issue upon the record before us, rather than remand this matter to the Court of Appeal. See La.Code Civ. Proc. art. 2164 ("The appellate court shall render any judgment which is just, legal, and proper upon the record on appeal.”); La.Code Civ. Proc. art. 2129 ("An assignment of error is not necessary in any appeal.”); see also Wooley, 09-0571 at pp. 62-63, 61 So.3d at 563 (law clearly authorizes appellate court to consider an issue on appeal in absence of an assignment of error). All other issues raised by the parties are hereby pretermitted and will not be discussed further in this opinion.

. In this regard, we find it noteworthy the Lease uses the phrase "on the leased premises or on land pooled therewith” in six other places, but the phrase is never followed by the modifier "as herein provided.” For example, Section 1(b) includes in the definition of "oil and gas” substances produced with the production of oil and gas from wells "on the leased premises or on land pooled therewith.” Section 3 sets forth the royalties to be paid on production from wells "on the leased premises or on lands pooled therewith.” Section 4 provides a shut-in well "on the leased premises or on land pooled therewith” maintains the Lease. Section 5 provides drilling operations on "the leased premises or on land pooled therewith” at the end of the primary term maintains the Lease. Section 7(a), which sets forth the general terms of the horizontal Pugh clause, provides completion of a. producing well "on the leased premises or on land pooled therewith, shall continue the Lease as to lands within "such unit.” Section 12 provides the Lease is maintained if drilling operations "on the leased premises or on land pooled therewith” is prevented by force maj-eure. It follows, therefore, that, if a compulsory unit well will maintain the Lease as a shut-in well, as a well being drilled at the end of the primary term, or as a well delayed by force majeure, it will maintain the Lease as a continuous drilling operation.
Moreover, Section 2 also provides for the continuation of the Lease as long as oil and/or gas is produced "from the leased premises, or land pooled therewith as herein permitted.” Reading the Lease in its entirety reveals the phrase "as herein permitted” refers to the limitations and divisibility imposed under the Pugh clause in Section 7, not to the manner in which pooling should occur.