**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**24-578**

**BRUCE LLOYD**

**VERSUS**

**DARLENE ELAIRE**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. 2023-2019
HONORABLE CYNTHIA SPADONI, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Charles G. Fitzgerald, Ledricka J. Thierry, and Wilbur L. Stiles, Judges.

**AFFIRMED.**

**Lawrence C. Billeaud**
**706 West University Avenue**
**Lafayette, Louisiana 70506**
**(337) 266-2055**
**Counsel for Plaintiff/Appellant:**
      **Bruce Lloyd**

**Afif Jebara**
**1001 West Pinhook Road**
**Building 3, Suite 104**
**Lafayette, Louisiana 70503**
**(337) 232-0055**
**Counsel for Defendant/Appellee:**
      **Darlene Elaire**

**FITZGERALD, Judge.**

In this appeal, we are asked to review the trial court's judgment dismissing Plaintiff's nullity action.

## FACTS AND PROCEDURAL HISTORY

Plaintiff, Bruce Lloyd, and Defendant, Darlene Elaire, were married in Louisiana in 2001. They physically separated in 2012. Many years later, in April 2023, Bruce filed a petition for divorce.

Importantly, on May 30, 2023, Bruce and Darlene filed a Joint Motion to Establish Interim and Final Periodic Spousal Support. In conjunction with the joint motion, they executed a Consent Judgment of spousal support.[1] The Consent Judgment was signed by the trial court on May 31, 2023.

In relevant part, the Consent Judgment provides that Bruce will pay Darlene interim spousal support in the amount of $500.00 per week until that obligation terminates by law. Bruce has been paying this weekly sum to Darlene since they separated in 2012.

As to final spousal support, the Consent Judgment provides that the $500.00 weekly payments shall continue until Darlene's death. The judgment further provides "that the obligation to pay final periodic support . . . as ordered herein shall be deemed contractual in nature and shall not be modified or waived regardless of any material change in the circumstances of either party whether such change is financial or otherwise."

Then, on August 3, 2023, Bruce filed a petition to annul the Consent Judgment for fraud or ill practices. A bench trial was held in June 2024. The trial court

---

[1] They also executed at that time an Act of Donation, whereby Bruce donated to Darlene his undivided one-half ownership interest in the former marital residence.

ultimately dismissed the nullity action. A final judgment to this effect was signed on July 17, 2024. Bruce now appeals this judgment.

On appeal, Bruce asserts the following assignments of error:

1. THE TRIAL COURT COMMITTED MANIFEST ERROR IN ITS REFUSAL TO NULLIFY THE SPOUSAL SUPPORT JUDGMENT BASED UPON FRAUD AND ILL PRACTICES.

   a. BRUCE LLOYD WAS NEVER TIMELY ADVISED OF THE NATURE OF THE DOCUMENTS PREPARED BY COUNSEL FOR DARLENE ELAIRE.

   b. BRUCE LLOYD'S LIMITED ABILITY TO READ AND WRITE IS ALSO A BASIS TO SET ASIDE THE JUDGMENT OF SPOUSAL SUPPORT.

   c. THE FACTUAL MISREPRESENTATIONS AND INTENTIONAL FAILURE TO PRESENT RELEVANT MATERIAL FACTS TO [JUDGE] MARILYN CASTLE CONSTITUTE "FRAUD" OR "ILL PRACTICES["] AS DEFINED BY THE LOUISIANA SUPREME COURT IN *KEM SEARCH, INC. V. SHEFFIELD, 434 SO.2D 1067 (LA. 1983).*

   d. [DARLENE] ELAIRE AND [BRUCE] LLOYD DID NOT HAVE THE REQUISITE "MEETING OF THE MINDS" TO CREATE A BINDING CONTRACTUAL, UN-MODIFIABLE SPOUSAL SUPPORT OBLIGATION.

   e. THE INCOME AWARD ORDERED HEREIN IS IN EXCESS OF THE STATUTORY LIMITATIONS FOR IMPOSITION OF A SPOUSAL SUPPORT AWARD AS DICTATED BY LOUISIANA CIVIL CODE ARTICLE 112.

   f. COUNSEL FOR [DARLENE] ELAINE [sic] VIOLATED LOUISIANA RULES OF PROFESSIONAL CONDUCT, RULE 4.3[.]

2. THE TRIAL COURT COMMITTED MANIFEST ERROR IN ITS FAILURE TO AWARD ATTORNEY FEES AND COURT COSTS AGAINST [DARLENE] ELAIRE AND HER ATTORNEY FOR THE MANNER IN WHICH THEY OBTAINED THIS SPOUSAL SUPPORT AWARD AND DONATION OF LLOYD'S INTEREST IN THE FAMILY HOME[.]

Darlene, on the other hand, timely answered the appeal and now requests damages against Bruce for a frivolous appeal.

## LAW AND ANALYSIS

### I.  Fraud or Ill Practices

Bruce initially asserts that the Consent Judgment of spousal support is null and void because it was obtained through fraud or ill practices.  Louisiana Code of Civil Procedure Article 2004(A) states that "[a] final judgment obtained by fraud or ill practices may be annulled."

To this end, our jurisprudence has established a two-step analysis for determining if a final judgment should be annulled on this basis: (1) whether the party seeking the annulment was deprived of a legal right, such as the right to appear and assert a defense; and (2) whether enforcement of the judgment would be unconscionable and inequitable. *Kem Search, Inc. v. Sheffield*, 434 So.2d 1067 (La.1983).

In *Kem Search*, 434 So.2d at 1070, the Louisiana Supreme Court addressed the scope of La.Code Civ.P. art. 2004, explaining:

> [T]he article is not limited to cases of actual fraud or intentional wrongdoing, but is sufficiently broad to encompass all situations wherein a judgment is rendered through some improper practice or procedure which operates, even innocently, to deprive the party cast in judgment of some legal right, and where the enforcement of the judgment would be unconscionable and inequitable.

Put differently, "the action provided by article 2004 is a distinct remedy designed to afford relief against a judgment procured by methods viewed with disdain by the judiciary." *Power Marketing Direct, Inc. v. Foster*, 05-2023, p. 13 (La. 9/6/06), 938 So.2d 662, 671.

As to the standard of review, "trial courts are permitted discretion in deciding when a judgment should be annulled because of fraud or ill practices, to which discretion reviewing courts will defer." *Id*. at 670. Hence, the appropriate standard of appellate review is abuse of discretion.

Now to the record evidence in the case before us. To summarize, Darlene testified that she and Bruce married in July 2001. At that time, they were both employed at Langlinais Bakery. But in 2003, Darlene was forced to quit that job when she developed carpel tunnel syndrome in both hands. She had surgery the following year.

Darlene then developed reflex sympathetic dystrophy. When asked about the symptoms of this condition, she explained: "RSD is like your hands are burning in a fireplace. My hand[s] cramp up. I also—it messes with the depressive nerve." She further explained that her condition is not curable and that she takes pain medication and muscle relaxers to address the symptoms.

After her employment with Langlinais Bakery, Darlene remained out of the workforce for many years. She then worked as a sitter in 2020. And most recently, Darlene worked part time for a business that rents flowers. By contrast, Bruce continues to work for Langlinais Bakery: he has been there thirty years. Bruce also earns cash income from various side jobs.

Darlene testified that in 2003, her health condition affected her relationship with Bruce: she was moody and aggravated, and sometimes she did not want Bruce to hold her. Then, on March 3, 2012, while Darlene was unemployed, Bruce told her that he had a girlfriend and that his girlfriend was pregnant. Bruce moved in with his girlfriend that same day.

According to Darlene, she was terrified by Bruce's decision to leave her. She was terrified about her ability to survive financially. As she put it: "I told him—I said, 'Well, how I'm gonna make it?' And he said, 'I'm a still take care of you.'" When asked whether Bruce said how long he would do that, Darlene responded: "For life. For—not to even worry about it."

After Bruce moved out of the marital residence, he immediately began paying Darlene $500.00 per week in cash. It is undisputed that Bruce voluntarily paid this weekly sum to Darlene for twelve years. He never missed a single payment. Then, on May 31, 2023, the Consent Judgment of spousal support was signed by the trial court. Bruce has complied with this support judgment ever since.

Darlene was then asked about her relationship with Bruce after their physical separation. She explained that it remained very cordial. For example, they have exchanged holiday greetings and birthday wishes. Bruce has fixed Darlene's car and taken care of odd jobs for her. And on occasion, Bruce has spent the night at the former marital residence, always using the spare bedroom.

Then, in June 2023, Bruce filed for divorce. Darlene testified that she learned of the divorce suit when Bruce called her from his girlfriend's cellphone. A few days later, Darlene met Bruce in front of Langlinais Bakery. The parties' testimony differs about what was discussed during this meeting. According to Darlene, she asked Bruce about his intentions for both spousal support and the former marital residence. As she recalled, Bruce told her that he would continue paying her support for life and that she should not worry about it. Bruce also said he would give her the house. Darlene insisted that they put this agreement "on paper," or she would file for spousal support. Darlene then asked Bruce if he wanted to hire a lawyer to draft

5

the paperwork. Bruce said no. So Darlene said she would take care of it. Bruce then gave her $1,500.00 in cash to assist with the legal fees.

By contrast, Bruce testified that he and Darlene never discussed spousal support when they met in front of Langlinais Bakery. He testified that they discussed the division of their community property. He acknowledged agreeing to give Darlene his one-half interest in the marital residence. But he emphasized that they did not discuss spousal support during this meeting.

After that meeting, Darlene hired a lawyer. And her lawyer ultimately drafted three documents: (1) Joint Motion to Establish Interim and Final Periodic Spousal Support, (2) Consent Judgment of spousal support, and (3) Act of Donation. The validity of the donation is not at issue in this appeal.

Once the documents were ready for signing, Darlene telephoned Bruce. Darlene testified that she asked Bruce to have the documents reviewed by his lawyer. She recalled telling him that "he can have his lawyer do it," referring to the notarization of Bruce's signature on the original documents, to which he responded that "he did not need a lawyer[.]" According to Darlene, Bruce did not ask to see the documents in advance of signing. Nor did he say much of anything about them.

Bruce, on the other hand, admitted that Darlene had informed him that the documents were ready about one week before they were signed. He also admitted not asking to see the documents in advance. But Bruce denied that Darlene said anything to him about having his lawyer review the documents. Yet Bruce admitted that he could have done so without much effort.

According to Darlene, about four days after notifying Bruce about the documents, she drove to Dr. Joe Abendroth's house. Bruce was working there that morning. Darlene asked Bruce if he would meet her at a notary public's office later

that day to sign the documents. Bruce agreed. The notary public was Barbara Williams. Bruce met Darlene at Ms. Willaims's office that afternoon. Bruce testified that when he walked into the notary's office, the documents were already on the table, and "the lady" slid the documents to him, asked him to sign, and he complied.

In contrast, Darlene testified that when she arrived at Ms. Williams's office, Bruce was already in the parking lot waiting in his truck. According to Darlene, she and Bruce walked into Ms. Williams's office together. Darlene introduced herself and then introduced Bruce as "my husband." Next, Darlene told Ms. Williams that she and Bruce had some legal documents to sign, one about spousal support and the other about transferring the house to her. Darlene removed the documents from an envelope, and she handed them to Bruce. Bruce, in turn, reviewed the documents and ultimately signed them in the presence of Ms. Williams.

Similarly, Ms. Williams testified that Darlene handed the documents to Bruce, that Bruce reviewed the documents, and that Bruce voluntarily signed the documents after reviewing them. According to Ms. Williams, Bruce did not ask for assistance in reviewing the documents. Nor did he express any confusion or a lack of understanding about what he was reading. Ms. Williams explained that she "would not have proceeded" if Bruce had expressed that he was confused or could not read. But this transaction, according to Ms. Williams, appeared as normal as any other.

Turning now to Bruce's six specific arguments in support of his first assignment of error.

Bruce's first argument is that he was not timely advised of the nature of the Joint Motion to Establish Interim and Final Periodic Spousal Support. Nor was he

timely advised of the nature of the accompanying Consent Judgment of spousal support. He argues that this amounts to fraud or ill practice. We disagree.

Very simply, Darlene testified that Bruce verbally agreed to continue paying her $500.00 each week for the rest of her life. Darlene then insisted that they reduce this agreement to writing, especially since Bruce was moving forward with the divorce. Bruce agreed, and he gave her $1,500.00 in cash to hire a lawyer to draft the legal documents. According to Bruce, Darlene notified him that the documents were ready seven days before he voluntarily signed them at the notary's office. He admitted to knowing the documents carried legal weight and to knowing he could have reviewed the documents or had a lawyer review them before signing. The documents are clearly titled and plainly written. And both Darlene and Ms. Williams testified that Bruce reviewed the documents at the time of signing. Hence, there is no basis for Bruce's argument that he was not timely advised of the nature of the Consent Judgment of spousal support.

Bruce's second argument is that his limited ability to read and write is also a basis to set aside the Consent Judgment. In support, Bruce points to his struggle to read while on the witness stand, to the misspellings in his petition for divorce, and to his need for Darlene to handle the bills during their marriage.

By contrast, Darlene notes that most of the evidence contradicts Bruce's claim of near illiteracy. For example, Bruce admitted graduating from high school. He even described himself as a good student. Dr. Abendroth also described Bruce as very intelligent. In addition, numerous text messages to and from Bruce were admitted into evidence, and these messages demonstrate his ability to read and write.

In *Tweedel v. Brasseaux*, 433 So.2d 133 (La.1983), the plaintiffs sought to rescind three acts of donation, which they signed, on the basis that they could not

8

read and thought they were signing wills, not donations. In rejecting their argument, the Louisiana Supreme Court provided the following statement of law:

> "[S]ignatures to obligations are not mere ornaments." *Boullt v. Sarpy*, 30 La.Ann. 494 at 495 [(La.1878)]. Additionally, the courts of our state have long held that "[i]f a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentively whilst this is being done." *Snell v. Union Sawmill Company*, 159 La. 604 at 608, 105 So. 728 at 730 (1925). *Bagneris v. Oddo,* 2 Pelt. 278 (La.App. 1919) held:
>
>> "The presumption is that parties are aware of the contents of writings to which they have affixed their signatures . . . The burden of proof is upon them to establish with reasonable certainty that they have been deceived." 2 Pelt. at 285.

*Id*. at 137.

Like *Tweedle*, the only evidence of Bruce's alleged illiteracy is his own testimony. The record here shows no evidence of deception, whether by fraud, ill practices, or otherwise. There is simply no merit to this argument.

Bruce's third argument is that Darlene's lawyer engaged in fraud or ill practices by misrepresenting material facts to the trial court. Again, we disagree.

The basis for Bruce's argument is the introductory language of the parties' Joint Motion to Establish Interim and Final Periodic Spousal Support. That language is reproduced as follows:

> **NOW INTO COURT**, comes the plaintiff, Bruce Lloyd, a person of the full age of majority and domiciled in Lafayette Parish, State of Louisiana, appearing herein in proper person, who represents to the Court that after consulting with his attorney *or after being provided with an ample opportunity and time to consult with his attorney before signing this motion and the accompanying judgment*, and also appearing herein the defendant, Darlene Elaire, a person of the full age of majority, domiciled in St. Martin Parish, through undersigned counsel, they jointly move this Honorable court for a judgment adopting the parties' agreement, stipulations, and compromise concerning interim and final periodic support as the judgment of the Court. [Second emphasis added.]

Even though the above language speaks for itself, Bruce asserts in his brief that he "was never provided a copy of this pleading in advance of signing *as represented to the Court*" and that he "did not get the benefit of counsel or literate adult review of the document *as represented to the Court*[.]" (Emphasis added). Yet in both instances, the "as represented to the Court" language is troubling because Darlene's lawyer never made those representations; the only representations were those on the face of the joint motion.[2] In any event, the record evidence shows that Bruce was "provided with an ample opportunity and time to consult with his attorney before signing th[e] motion and the accompanying judgment[.]" Thus, there is no basis for this argument.

Bruce's fourth argument is that he and Darlene did not have the requisite meeting of the minds to create a binding, unmodifiable spousal support obligation. We again disagree.

The subject of Bruce's nullity action is the Consent Judgment of spousal support. The essence of a consent judgment was addressed in *M.P.W. v. L.P.W.*, 13-366 (La.App. 1 Cir. 11/1/13), 136 So.3d 37. There, the first circuit explained:

> A consent or a stipulated judgment is a bilateral contract by which the parties adjust their differences by mutual consent, with each party balancing his hope of gain against his fear of loss. Its binding force arises from the voluntary acquiescence of the parties rather than the adjudication by the court.

*Id*. at 43–44 (citations omitted).

Here, Darlene testified that Bruce agreed to continue paying her $500.00 each week—as he has done since 2012—for the remainder of her life. Bruce, in turn,

---

[2] Bruce also argues that Darlene's lawyer failed to disclose material facts to the trial court. But again, there is nothing in the record to support this contention, especially considering that the only statements of fact are those on the face of the joint motion.

continued paying her this amount after signing the joint motion and accompanying Consent Judgment, reflecting his understanding and acceptance of their agreement.

But even more to the point, the argument being advanced by Bruce does not fit under La.Code Civ.P. art. 2004: Bruce is not arguing that the Consent Judgment of spousal support was obtained through fraud or ill practices; he is arguing that he signed the judgment in error. In his brief, he claims that he thought he was signing community property documents, as opposed to a support judgment. If true, this would be an error of fact. "[A] stipulated judgment (as opposed to other final judgments rendered against a party without their consent), being a bilateral contract, may also be annulled pursuant to La. C.C. art.1948 for vices of consent, *i.e.:* (a) error of fact or of the principal cause of the agreement[.]" *M.P.W.*, 136 So.3d at 45 (citations omitted).

However, "[e]rror vitiates consent only when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party." La.Civ.Code art. 1949. Put another way, "one party can be mistaken and that mistake will vitiate consent if the other party knows or should have known." *Peironnet v. Matador Resources Co.*, 12-2292, p. 20 (La. 6/28/13), 144 So.3d 791, 807.

In this case, the evidence demonstrates that Bruce understood what he was signing. But even if Bruce was in error, there is no evidence that Darlene knew or should have known of his mistake. Hence, his fourth argument is misplaced.

Bruce's fifth argument is that the Consent Judgment should be annulled because the amount of final support exceeds the one-third limitation contained in La.Civ.Code art. 112.[3] This argument is legally flawed.

Unlike interim spousal support, "permanent alimony [now final spousal support] is not a law enacted for the public interest. Rather, it was enacted to protect individuals, i.e., not-at-fault divorced spouses in need. Thus, the prohibition found in article 7 of the Civil Code does not apply." *McAlpine v. McAlpine*, 94-1594, p. 16 (La. 9/5/96), 679 So.2d 85, 93.

Additionally, La.Civ.Code art. 116 states that "[t]he obligation of final spousal support may be modified, waived, or extinguished by judgment of a court of competent jurisdiction or by authentic act or act under private signature duly acknowledged by the obligee." The revision comments to La.Civ.Code art. 116 then provide: "This Article recognizes that final spousal support is not a matter of public order about which couples are forbidden to contract under Civil Code Article 7. Instead, spouses are permitted to contract concerning final spousal support at any time before or during marriage, or after divorce."

And here, Darlene and Bruce did just that: they entered into a contract about the amount and duration of final spousal support. The Consent Judgment reflects their agreement. The one-third limitation on final spousal support in La.Civ.Code art. 112(E) has no application to contractual support, which is what we have here. Simply put, Bruce bargained away his right to have the trial court adjudicate final spousal support in accordance with Article 112.

---

[3] La.Civ.Code art. 112(E) states in part: "The sum awarded under this Article shall not exceed one-third of the obligor's net income."

One more thing: the record evidence shows that Bruce has many sources of income, most of which were begrudgingly disclosed during cross-examination.  So even if the one-third limitation did apply (which it does not), the evidence does not support Bruce's argument that the amount of final spousal support ($500.00 per week) exceeds one-third of his net income.

Bruce's sixth and final argument is that Darlene's lawyer committed fraud or ill practices by violating Rule 4.3 of the Louisiana Rules of Professional Conduct.  This argument is problematic for two reasons.  First, there is no evidence to support it.  And second, the argument reflects a misunderstanding of Rule 4.3.

La.Rules Prof.Conduct, Rule 4.3 states:

> In dealing on behalf of a client with a person who is not represented by counsel, a lawyer shall not state or imply that the lawyer is disinterested.  When the lawyer knows or reasonably should know that the unrepresented person misunderstands the lawyer's role in a matter, the lawyer shall make reasonable efforts to correct the misunderstanding.  The lawyer shall not give legal advice to an unrepresented person, other than the advice to secure counsel, if the lawyer knows or reasonably should know that the interests of such a person are or have a reasonable possibility of being in conflict with the interests of the client.

Thus, Rule 4.3 protects unrepresented persons, like Bruce, from lawyer overreaching (1) by prohibiting the lawyer from stating or implying disinterestedness, (2) by imposing a disclosure requirement when the unrepresented person misunderstands a lawyer's role, and (3) by limiting the legal advice that can be given.

In our case, Darlene's lawyer did not have any communication with Bruce.  The joint motion and accompanying Consent Judgment plainly stated that Darlene was represented by counsel and that Bruce was not.  And at no time did Darlene's lawyer give Bruce any legal advice.

Based on our review of the record, there is no evidence—none—that Darlene's lawyer violated La.Rules Prof.Conduct, Rule 4.3. Bruce's sixth argument is therefore without merit.[4]

In the end, the trial court was presented with two different versions of events: one from Darlene; the other from Bruce. The trial court observed Darlene and Bruce as they testified under oath and subject to cross examination. "[O]nly the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said." *Powell v. Craft*, 48,004, p. 5 (La.App. 2 Cir. 6/26/13), 117 So.3d. 298, 301. The trial court ultimately chose to believe Darlene's version of events. Her testimony is also supported by other evidence adduced at trial; Bruce's testimony is not.

All in all, our review of the record shows that the Consent Judgment of spousal support was not procured by some improper practice or procedure, that Bruce was not deprived of a legal right, and that enforcement of the Consent Judgment would not be unconscionable and inequitable. Hence, the trial court did not abuse its discretion in dismissing Bruce's nullity action.

## II.    Attorney Fees

In his second assignment of error, Bruce asserts that the trial court erred by not awarding him attorney fees under La.Code Civ.P. art. 2004(C), which states: "The court may award reasonable attorney fees incurred by the prevailing party in an action to annul a judgment on these grounds."

---

[4] Also, the cases cited by Bruce—*In re: Guilbeau*, 09-2202 (La. 3/16/10), 35 So.3d 207; and *In Re: Daniel James Stanford & John Kevin Stockstill*, 10-670 (La. 10/19/10), 48 So.3d 224—have no application to the matter before us. The lawyer in *Guilbeau* failed to clarify his role after communicating with the unrepresented party. And the lawyers in *Stanford* had the victim in a criminal proceeding sign a confidentiality agreement, causing the victim to believe that she was barred from testifying at trial.

Put simply, Bruce's nullity action was dismissed by the trial court. Because that judgment is being affirmed in this appeal, Bruce's second assignment is also without merit.

## III. Frivolous Appeal

In her answer to Bruce's appeal, Darlene requested damages for a frivolous appeal under La.Code Civ.P. art. 2164.

In relevant part, La.Code Civ.P. art. 2164 states that the appellate "court may award damages, including attorney fees, for frivolous appeal or application for writs, and may tax the costs of the lower or appellate court, or any part thereof, against any party to the suit, as in its judgment may be considered equitable."

The fourth circuit addressed this issue in *Alexander v. Louisiana State Bd. of Priv. Investigator Examiners*, 19-778 (La.App. 4 Cir. 4/1/20), 293 So.3d 1243, *writ denied*, 20-1072 (La. 11/10/20), 303 So.3d 1039. In denying the request for damages, the appellate court explained:

> "Appeals are always favored and, unless the appeal is unquestionably frivolous, damages will not be granted." *Tillmon v. Thrasher Waterproofing*, 00-0395, p. 8 (La. App. 4 Cir. 3/28/01), 786 So. 2d 131, 137. This Court further stated that "[a]n appeal is frivolous if it does not present a substantial legal question, if the sole purpose of the appeal is delay, or if the appealing counsel does not seriously believe the view of the law that he advocates." *Id*. However, "[t]his court is reluctant to grant frivolous appeal damages because of the chilling effect it may have on the appellate process." *Id*.
>
> Damages for a frivolous appeal will be awarded if the appellant is attempting to delay the action, if the appellant does not believe what he is advocating, or if the appeal presents no "'substantial legal question.'" *Hunter v. Maximum Grp. Behavioral Servs., Inc.*, 10-0930, p. 6 (La. App. 4 Cir. 3/16/11), 61 So. 3d 735, 739 (quoting *Tillmon*, 00-0395, p. 8, 786 So. 2d at 137). "Damages for frivolous appeal are properly awarded only when the proposition advocated is so ridiculous or so opposed to rational thinking that it is evident beyond any doubt that it is being deliberately professed for ulterior purposes." *Bottle Poetry, LLC v. Doyle Rest. Grp. Co., LLC*, 13-0406, p. 9 (La. App. 4 Cir. 1/15/14), 133 So. 3d 60, 67.

*Id.* at 1256–57.

Indeed, "[t]he slightest justification for an appeal precludes damages for a frivolous appeal." *Collins v. Franciscan Missionaries of Our Lady Health System, Inc.*, 19-0577, p. 11 (La.App. 1 Cir. 2/21/20), 298 So.3d 191, 198, *writ denied*, 20-480 (La. 6/22/20), 297 So.3d 773.

In our view, Bruce's appeal is not unquestionably frivolous. There is no evidence that Bruce filed this appeal in bad faith or for delay purposes. Darlene's request for damages is therefore denied.

## DISPOSITION

The trial court's judgment of May 31, 2023, is affirmed. The costs of this appeal are assessed to Plaintiff, Bruce Lloyd.

**AFFIRMED.**